[Crim. No. 11479.   Second Dist., Div. Two.   June 22, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. EDWARD DEE PUTTY, Defendant and Appellant.

Arthur Mabry, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Ronald M. George, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—Defendant appeals from the judgment entered following a jury trial that resulted in his conviction of receiving stolen property in violation of Penal Code section 496. His purported appeal from the order denying his motion for new trial must be dismissed. (Pen. Code, § 1237.) Prior convictions of burglary and grand theft were admitted by appellant.

Appellant contends that his oral incriminating statements were improperly received in evidence because (1) there was insufficient evidence *aliunde* these statements to establish the corpus delicti; and (2) the undercover officers who were negotiating with appellant for the purchase of the stolen items failed to advise him of his constitutional rights as required by *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. Appellant further contends that he was denied his "constitutional right of equal protection" by reason of the trial court's refusal to order preparation of a full reporter's transcript to assist his substituted counsel in arguing his motion for a new trial.

We have concluded that appellant's contentions are without merit. Our review of the record has disclosed the absence of error and the presence of overwhelming evidence of appellant's guilt.

A warehouse owned by the Rochlin Company, an exclusive factory representative for several lines of machine tools, was burglarized on July 9, 1964. The missing merchandise included straight and stagger-tooth key set cutters, center drills and lengths, arbor type cutters, and T-slot cutters. Their value at dealer's cost was slightly under $15,000.

On November 2, 1964, the premises owned by the Swiss Precision Instruments Company were also burglarized. Among the stolen merchandise were Universal drill jigs, micrometers, a special type of Swiss drill chuck of which the company was the sole importer in the United States, and rare rotary tables of which the company was the sole distributor in the 11 Western states. The wholesale value of the missing goods was approximately $7,500.

Marvin Bell, who operated a Texaco service station in Los Angeles, testified that on February 15, 1965, appellant, whom he had seen on two or three prior occasions, drove into his station in a 1958 Buick and inquired if Bell could "handle or sell" some machine tools for him. Bell asked appellant whether the items were "hot," i.e., stolen. Appellant replied, "By this time they should be cool, they are approximately seven months old, and there should be no heat behind them."

Bell told appellant that he might agree to handle the items but that appellant would first have to provide him with a sample of the merchandise to show a prospective buyer. Appellant replied that this was agreeable to him and left, stating that he would return later that day with a sample. Bell then contacted the police. At 3 or 4 p.m. that day, appellant returned to the station bringing numerous small containers, in which there were various sizes of key set cutters and a box of angle drills. Appellant left these items as samples to be shown to a prospective buyer.

Appellant told Bell that he had approximately $6,000 worth of this particular type of cutter and approximately $30,000 worth of various types of machine tools. Bell said that he would obtain as much for the tools as possible and agreed to appellant's request that he attempt to obtain 35 percent of list price for the merchandise. Bell advised appellant that he was almost positive that he could make a sale and requested appellant to leave the remainder of the merchandise with Bell on "consignment."

Later the same day appellant returned to the station and showed Bell a crate of tools inside the trunk of appellant's automobile. It weighed some 150 to 175 pounds and was removed and placed in Bell's car in accordance with their "consignment" agreement. Appellant indicated that Bell should attempt to sell them for $600 and accepted a $20 advance payment on the sale from Bell when the latter indicated that he did not have the $200 requested by appellant. Thereafter, Bell showed these tools to Officer Richard Olson of the Los Angeles Police Department.

On February 17, 1965, Officer Olson, representing himself as a "reliable businessman," met with Bell and appellant and informed appellant that while he wished to purchase such equipment, he was hesitant to make such a small purchase of stolen merchandise. Although Bell told appellant that he knew Olson and that he was "all right" appellant indicated that while he had additional merchandise, it was in the City of Oakland and he preferred to sell it to Bell rather than to

Olson directly. However, after further negotiations in which appellant indicated that he would require payment for the merchandise already delivered to pay for the expenses of his trip to pick up the remainder of the property, appellant accepted $250 as part payment and gave Olson a written receipt signed "Mr. Davis." Appellant told Olson that when he knew him better he would put him in contact with a friend who would sell him $40,000 worth of merchandise "at the right price." In the interim, appellant said that he would go to Oakland, pick up $12,000 worth of tools, and let Bell know on the following day where Olson and appellant could meet to arrange the sale of these additional items.

Thereafter, other officers kept appellant's car under surveillance and followed it after it left Los Angeles as far as Indio, California. They broke off surveillance after appellant continued on in the direction of Blythe and Arizona. On the following day law enforcement officers at Blythe informed the Los Angeles police that appellant's car had re-entered the state. The Los Angeles police resumed their surveillance when appellant's car, driven by appellant, was observed entering the Los Angeles area on the San Bernardino Freeway near Covina. Contrary to its appearance when it left the city, the vehicle now appeared to be riding low because of a heavy weight in the trunk.

On instructions received over the radio, the trailing officers stopped appellant's car and placed him under arrest. One of the officers knew appellant and had arrested him in 1964 on a charge involving burglary and theft of precision machinery tools. He advised appellant of his constitutional rights in accordance with the rule enunciated in *People* v. *Dorado, supra,* 62 Cal.2d 338, and appellant indicated that he understood these rights. Appellant thereafter stated that he had driven up to Oakland and obtained a load of tools from a man named James Jefferson. A search of the trunk of appellant's car revealed numerous tools subsequently established as among those stolen in the Rochlin Company and Swiss Precision Instruments Company burglaries. Appellant related that James Jefferson and other men would commit burglaries and obtain the tools and that he "was merely selling them for them." Appellant claimed to have paid Jefferson $100 for the tools found in his car at the time of his arrest.

By way of defense appellant testified that he had purchased the stolen equipment in good faith from a person named Leon Wagner in Burbank. He had never asked Wagner if the tools

had been stolen because Wagner "seemed the business type." Appellant said that he paid cash for the tools and offered into evidence two sales slips and two bills of sale covering purchases on February 15 and February 18, 1965, of $790 worth of key set cutters and assorted drills.

Appellant denied that he had ever left the city or that he had ever told Bell or Olson that he knew the merchandise was "hot." When a recording of his conversation with the police following his arrest was played before the jury for impeachment purposes during his cross-examination, he denied that either of the voices was his.

■ Appellant's contention that the court should not have permitted evidence concerning his statements made to Bell and later to Officer Olson during their negotiations for the sale of the stolen property is not well taken in the first instance because such statements are not truly within the basic rules relating to hearsay and extrajudicial confessions and admissions. That is to say, those statements indicating appellant's awareness or belief that the merchandise was stolen were not introduced to prove that the merchandise, in fact, was stolen property. They were "verbal acts" properly received both to explain the physical acts they accompanied and also as evidence relating to appellant's knowledge and state of mind.

■ " 'The Hearsay rule excludes extrajudicial utterances only when offered for a special purpose, namely, as *assertions to evidence the truth of the matter asserted.*' (6 Wigmore, Evidence (3d ed. 1940), § 1766, p. 178, cited with approval in *People* v. *Bickley*, 57 Cal.2d 788, 795 [22 Cal.Rptr. 340, 372 P.2d 100].)

"As said in *People* v. *Marsh*, 58 Cal.2d 732, 738 [6] [26 Cal.Rptr. 300, 376 P.2d 300] : 'Wigmore says, "Wherever an utterance is offered to evidence the *state of mind* which ensued *in another person* in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is therefore admissible, so far as the Hearsay rule is concerned." ' (6 Wigmore, Evidence (3d ed. 1940) p. 235. See also 1 Wharton, Criminal Evidence (12th ed. 1955) p. 591, 'The question is merely whether they had any effect upon the mental state of the defendant.')

" 'California is in accord with this general rule.' (See also *People* v. *Davis*, 62 Cal.2d 791, 798 [5] [44 Cal.Rptr. 454, 402 P.2d 142].)" (*People* v. *Tahl*, 65 Cal.2d 719, 739 [56 Cal. Rptr. 318, 423 P.2d 246].)

■ There was no question in the instant case that the property involved was stolen. Proof that such property was received, concealed or held with knowledge that it was stolen may be established by inference from ''possession of stolen property, accompanied by no explanation, or an unsatisfactory explanation of the possession, or by suspicious circumstances . . .'' (*People* v. *Lyons,* 50 Cal.2d 245, 258 [324 P.2d 556] ; *People* v. *McFarland,* 58 Cal.2d 748, 754 [26 Cal.Rptr. 473, 376 P.2d 449], and cases cited therein.) A statement made during the course of the negotiations for sale of stolen property that the vendor believes it to be stolen would appear at the very least to be ''an unsatisfactory explanation for possession.''

In addition, appellant in his discussion of the corpus delicti of the crime of receiving stolen property confuses the necessity to establish that such crime had been committed by *some* person with the question of proof that such person was appellant. (Cf. 7 Wigmore, Evidence (3d ed. 1940), § 2072, p. 401.) **[4]** However, even assuming that appellant's verbal acts could not be considered in establishing the corpus delicti, the circumstantial evidence was otherwise sufficient to establish prima facie proof thereof, i.e., the bulk sale of an assortment of highly valuable precision machine tools out of the trunk of an old car in a gas station is sufficient to sustain an inference that appellant had not come by his possession of the goods in the ordinary channels of commerce.

■ Appellant's contention that Officer Olson should have advised him of his constitutional rights during the time he was posing as a prospective purchaser of the stolen property is not well taken. ''The argument that the *Dorado* doctrine extends to statements made in the course of commission of the crime itself is patently fallacious . . .'' (*People* v. *Ayers,* 237 Cal.App.2d 351, 354 [46 Cal.Rptr. 878], cert. den. 384 U.S. 912 [16 L.Ed.2d 364, 86 S.Ct. 1355]. Also see *Lewis* v. *United States,* 385 U.S. 206 [17 L.Ed.2d 312, 315-316, 87 S.C. 424] ; *People* v. *Candelario,* 239 Cal.App.2d 68, 69 [48 Cal.Rptr. 494] ; *People* v. *Sogoian,* 232 Cal.App.2d 430, 432 [42 Cal.Rptr. 736].)

To understand appellant's third assignment of error a further recital of the procedural development of the instant case is required. Following the return of the jury's verdicts of guilty on May 26, 1965, the cause was continued to June 11, 1965, for probation and sentence hearing. The matter again was continued to June 15, 1965, on appellant's motion to

permit preparation of a motion for new trial. On June 15, 1965, appellant appeared with the deputy public defender who had represented him at trial and who advised the court that appellant wished to move for a new trial on the ground that he had not been adequately represented by counsel during his trial. The deputy public defender noted the rather obvious fact that he could scarcely be expected to present this motion to appellant's satisfaction and suggested either that new counsel be appointed or that appellant represent himself in connection with this aspect of his motion. The court determined that appellant should speak for himself on this issue.

Thereafter, appellant and the deputy public defender addressed the court on the question of the adequacy of counsel's efforts to locate certain persons described by appellant and the propriety of his decision not to call the only one that could be found. At this juncture the deputy district attorney, purportedly ''not speaking as a prosecuting attorney, but more or less as an interested party,'' suggested that while he saw no merit in appellant's contention, it might be advisable to appoint new counsel pursuant to Penal Code section 987a in the interests of justice.

The court determined to follow this questionable suggestion although noting: ''I want to say, first of all, that in my opinion, in observing the trial, this case was well prepared and very well tried—very well prepared and very well tried by Mr. Rasmussen [Deputy Public Defender], on behalf of this defendant, and that I would not consider granting a motion on the grounds that the defendant was not adequately represented in this trial, or in the preparation for trial. . . . I wish to compliment, on the record, Mr. Rasmussen for the way in which this trial was conducted, and the thoroughness with which it appeared to the Court that he performed his function.''

The court nevertheless proceeded to appoint another attorney to represent appellant in connection with his motion for new trial and the matter was again continued. Newly appointed counsel thereafter moved the court to have prepared a trial transcript suggesting that by reason of his unfamiliarity with the antecedent proceedings, he could not properly perform his duties without such a record. After considering this motion, the court concluded that there was no reason to have the People's case in chief transcribed since it was essentially identical to the transcript of the preliminary hearing that was already available. The court therefore ordered the preparation

of a transcript of the proceedings commencing with presentation of appellant's defense and all matter in rebuttal. In addition, the court ordered the district attorney to make available to appellant's counsel those portions of the tape recording which were introduced into evidence during the trial. This arrangement apparently was satisfactory to appellant and his new counsel for they offered no objection thereto and requested only that the transcript of the hearing wherein the public defender had been dismissed also be made available. The court granted this additional request.

On July 12, 1965, appellant's new counsel presented his motion for a new trial. He began by informing the court that he had duplicated the efforts previously made by the staff of the public defender's office to locate the Mr. Leon Wagner from whom appellant had allegedly purchased the stolen property. He reported that his endeavors were equally unsuccessful and he had ''concluded that reasonable diligence could not produce Mr. Wagner either at the trial or for the purposes of this motion for a new trial.''

Counsel further informed the court that the one witness that had been located but not called by appellant's trial counsel would have been able to testify only that Bell had been previously arrested for receiving stolen property. Counsel advised the court that he tended to agree with trial counsel that such testimony would have been inadmissible for impeachment purposes, but even assuming that it might have been received, the decision whether or not to introduce it was properly within the discretion of counsel and did not constitute grounds for a new trial.[1] He stated, ''I'm not suggesting that the Deputy Public Defender committed any error in judgment in not calling Mr. Green [the witness involved] to the stand. I am merely stating that if in fact his not calling Mr. Green to the · stand was an error in judgment I did not believe that the

---

[1]Mr. Rasmussen who was also present at the motion for new trial augmented this accurate estimate of the situation as follows: ''I would like to make a short statement on the question of whether I should have called Mr. Green as a witness. I think there are some facts that Mr. Levin doesn't know about in that respect and that is that at the time, Mr. Green was serving time in the County Jail. Secondly, he had been previously convicted of four felonies and I may be mistaken on the number, but there were several felonies, and I felt that if I called Mr. Green as a witness on the reputation of Mr. Bell, then Mr. Green could be impeached by showing that he had been convicted of these prior felonies, the jury would hear that, and that would do Mr. Putty more harm than good. The jury wouldn't give any weight to his testimony in any event. So that is the reason I did not call Mr. Green, Your Honor, very briefly.''

cases would support a conclusion that any error of judgment of this nature would be grounds for a new trial.''

Counsel then suggested that entrapment might have been involved but that he would submit this point without argument. There was, of course, no evidence to support such a suggestion either in the prosecution's case or in appellant's defense.

Thereafter, appellant's counsel devoted the balance of his argument to the one issue he felt had merit, i.e., the *Dorado* contention which we have considered and rejected. No contention was made that the presentation of appellant's motion actually was impaired by the failure of the trial court to order a full transcript of the trial although the possibility that some point might be missed under the instant circumstances was called to the court's attention. The court announced its ruling in the following manner:

''I have considered this matter quite carefully. I want to compliment counsel on the thoroughness of his argument and, in spite of his own admissions, his preparation I believe for this argument. I made my—I would like to say one or two things about the adequacy of the record that you have had, Mr. Levin, as a basis for this motion. I have—as I believe I indicated at the last hearing, I have read the preliminary transcript, compared it to my extensive notes of the trial and also my recollection and felt that as to the People's case the record of the—of the transcript of the preliminary hearing was close to the matters on trial other than of course as you have indicated that there were no objections that were stated but I'm operating on the assumption that all of the points you have raised were adequately reserved by objection. So on that point I believe that Mr. Putty has had able and adequate and extensive representation in respect to this motion and therefore the motion for a new trial will be denied—is denied.''

Bearing in mind that the trial court was persuaded to appoint new counsel to represent appellant upon the hearing of his motion for a new trial only because of appellant's assertion that his trial counsel had not represented him in a competent manner and had been derelict in failing to call available witnesses in defense, and bearing in mind also that newly appointed counsel found, after careful investigation, that these accusations against trial counsel were groundless, it appears that appellant was accorded unusual consideration in this case.

It is common knowledge that a full transcript of the trial

proceedings is rarely available for use in connection with new trial proceedings regardless of the affluence or indigence of the defendants involved. ■ For obvious reasons the need for a trial transcript to enable an appellate court to perform its functions of review on appeal, or in connection with other available post-conviction proceedings, simply does not exist to effectuate the purpose of a new trial proceeding conducted by the judge who presided at the trial and heard within a very short time thereafter.

■ Nevertheless, out of a generous abundance of care and consideration, the trial court in this case did provide appellant with transcripts of the trial proceedings which in a practical sense were more complete than necessary. As we have seen, appellant's trial counsel collaborated with newly appointed counsel in the new trial proceedings in all respects except, of course, the matter of the competence of his efforts on behalf of the accused. Our review of the record fully confirms the observation of the trial judge that the deputy public defender whose efforts appellant sought to disparage performed his duties throughout the trial with commendable diligence and competence.

For the purposes of this review of appellant's appeal from the judgment of conviction, the People of California have provided him and this court with a full and complete transcript of the trial proceedings and a record which contains everything that he has requested—a record as complete and adequate as would be available to the most affluent defendant. As we have indicated, our review of this record discloses the absence of error and affirmatively demonstrates that appellant was accorded a full and fair trial.

In the light of the foregoing, it is evident that appellant's reliance upon *Griffin* v. *Illinois,* 351 U.S. 12 [100 L.Ed. 891, 76 S.Ct. 585, 55 A.L.R.2d 1055]; *Smith* v. *Bennett,* 365 U.S. 708 [6 L.Ed.2d 39, 81 S.Ct. 895]; *Lane* v. *Brown,* 372 U.S. 477 [9 L.Ed.2d 892, 83 S.Ct. 768]; and *Long* v. *District Court of Iowa,* 385 U.S. 192 [17 L.Ed.2d 290, 87 S.Ct. 362] is completely misplaced. (Cf. *State* ex rel. *Macon* v. *Orange Circuit Court,* 245 Ind. 269 [198 N.E.2d 229, 230] et seq., cert. den. 380 U.S. 981 [14 L.Ed.2d 274, 85 S.Ct. 1345]; *State* v. *Barrett* (Mo.) 406 S.W.2d 602, 604; *Jones* v. *Breslin* (Ky.) 385 S.W. 2d 71.)

The judgment is affirmed, and the appeal from the order denying the motion for a new trial is dismissed.

Roth, P. J., and Fleming, J., concurred.