[Crim. No. 24060. Second Dist., Div. Five. June 28, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND M. RAMIREZ, Defendant and Appellant.

## COUNSEL

Whatley, Roden, Monk & Johnson, Whatley, Roden & Monk and Jerry D. Whatley for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KAUS, P. J.**—Defendant Raymond M. Ramirez was convicted, after a jury trial, of two counts of selling heroin. (Former Health & Saf. Code, § 11501.) He was sentenced to concurrent prison terms.

### FACTS

The only defense was entrapment. The facts are stated accordingly:

Claire Cain, defendant's friend, was a heroin user, who bought "from the man next up the ladder . . . and tries to sell it to support his habit . . . ." Cain's wife, Mary, was also an addict. Sometime before August

1972 Cain was arrested and charged with seven counts of selling heroin, based on seven separate sales totalling $225, to an undercover sheriff's deputy, Consoli. The quantity of each sale—one-half to one gram bindles—was the amount sold "on the street" to an addict.

On August 14, 1972, while Cain was confined in a drug abuse center, he was contacted by Captain Honey and Sergeant Bregante of the Santa Barbara Sheriff's Department. A deal was made: if Cain worked as an "undercover informant" for the sheriff's department in "apprehending major heroin dealers," and stayed off heroin "an arrangement would be made for his attorney and for the District Attorney's office to get together in an attempt to work out a settlement." Cain was told that the sheriff's department would "have to have production."

Defendant had first met Claire Cain in 1967. Both were house painters and heroin addicts. They were "very close friends" over the years. Defendant allegedly gave up using narcotics in about 1969; he believed that Cain continued to use narcotics.

Certain facts of the two sales with which defendant was charged are undisputed. On August 17, 1972, he sold one ounce of heroin for $600. (Count I.) The street value of the heroin, which could be cut in half with milk-sugar—"stepped on once"—and then broken down into about 60 bindles, was about $1,800.

On October 17 defendant sold one-half ounce of heroin for $250. (Count II.) This heroin could not be cut.

The disputed facts turn on the circumstances of the sales. Undercover Agent Clarke, who was involved in the August 17th sale, testified that Cain set up a meeting between them and defendant. In the course of the transaction, defendant offered a volume discount—two ounces for $800—and said that he had five or six ounces and if Clarke came back soon defendant could probably sell him another ounce. The sale was made to Clarke. Deputy Consoli, who was involved only in the October 17th sale, testified that on that day he purchased the heroin from defendant. Cain was present on both occasions.

According to defendant, Cain called him three or four times a day, starting about August 4. About August 17—several days after Cain agreed to work undercover—Cain phoned defendant repeatedly to say that he and his wife Mary were sick and needed a fix. Defendant went to Oxnard to pick up an ounce—a "piece"—of heroin which he bought for $600 on credit. Cain said that he and Clarke were going "halfers" on the ounce,

and they each paid defendant $300. After the sale on August 17th, Cain phoned defendant at least once a day, saying that he and his wife were sick and had run out of stuff, that nobody would trust him. Defendant again went to Oxnard and got heroin on credit. He sold it to Cain for $250, the price defendant owed. After the transaction, Cain introduced Consoli to defendant as "Sonny," his "crime partner."

Defendant took a "spoonful" of heroin from each of the packages sold and used it himself. He obtained the heroin and sold it to Cain only because Cain was a friend and desperate.

Defendant was arrested by 10 officers at his residence on December 5, 1972. His home was searched, but nothing was discovered. The state narcotics agent testified he did not expect to find anything, because he heard defendant call Cain a "fink" during a telephone conversation earlier that day and assumed that defendant knew he had been dealing with undercover agents.

Additional facts will be added in the discussion.

## DISCUSSION

On appeal defendant contends:

1. The court should have given the jury the usual instruction to the effect that oral admissions of a defendant ought to be viewed with caution;

2. The court erred in striking testimony relating to defendant's belief that Claire and Mary Cain were heroin addicts;

3. The court gave the jury confusing and contradictory instructions on the law of entrapment; and

4. The court failed to instruct on possession of heroin as a lesser included offense.

We find that the first three contentions have theoretical merit. In the context of this case, however, the errors were not prejudicial. The fourth point is not well taken.

## I.

State Narcotics Agent Clarke testified to a conversation with defendant which indicated defendant's willingness to sell heroin and to offer a quantity discount for future sales. Deputy Sheriff Consoli testified that defendant told him the heroin sold by defendant could not be cut up but

should be sold as is. These statements were intended to show that defendant was a commercial dealer and not just doing a friend a favor.

Most of the evidence concerning oral statements by defendant—though not all of it—consisted of four tape-recorded telephone conversations summarized in part IV of this opinion.

At the People's request the jury was given an edited version of CALJIC No. 2.71 ("Admission—Defined"). They were told the difference between an "admission" and a "confession," that they were the exclusive judges of the truth of the purported statements, and that they need not believe or disbelieve the alleged statements in entirety. The last line of CALJIC No. 2.71 was, however, eliminated. "Evidence of an oral admission of the defendant ought to be viewed with caution."

Defendant contends that the court erred in striking this cautionary language. We agree. Although no caution is needed where the admissions are tape-recorded (*People* v. *Hines,* 61 Cal.2d 164, 173 [37 Cal.Rptr. 622, 390 P.2d 398]), the trial court is otherwise required to instruct the jury *sua sponte* that evidence of oral admissions must be viewed with caution (*People* v. *Beagle,* 6 Cal.3d 441, 455 [99 Cal.Rptr. 313, 492 P.2d 1]).

The People assert that the rule governing oral admissions does not apply here, because defendant's statements to the narcotics agents were "verbal acts," part of the crimes and not admissions concerning them. (See *People* v. *Putty,* 251 Cal.App.2d 991, 996 [59 Cal.Rptr. 881].) However, whether defendant's statements were "verbal acts" and therefore not hearsay (Evid. Code, §§ 125, 1200) or admissions but admissible as an exception to the hearsay rule (Evid. Code, §§ 1204, 1220) does not determine whether they should be viewed with caution.

The cautionary instruction should be given in any event: "[T]he main reason for the rule [that oral admissions must be viewed with caution][1] is the inability of a person to repeat exactly the words of another person. . . . [¶] This kind of testimony is considered dangerous, first, because it may be misapprehended by the person who hears it; secondly, it may not be well remembered; thirdly, it may not be correctly repeated." (*People* v. *Gardner,* 195 Cal.App.2d 829, 832 [16 Cal.Rptr. 256].)

Thus, the reasons for finding such testimony dangerous apply regardless of the evidentiary label attached to the testimony. The dangers are par-

[1]*Gardner* was interpreting Code of Civil Procedure section 2061, subdivision 4, now repealed. (195 Cal.App.2d at pp. 831-832.) Although the section has been repealed, the decisional law to the same effect remains unchanged. (*People* v. *Beagle, supra,* 6 Cal.3d 441, 445, fn. 4.)

ticularly apparent in this case: no one disputes that defendant made two sales. What is disputed is to whom and the circumstances under which defendant made them. The court erred in striking the cautionary language in CALJIC No. 2.71.

## II.

■ Defendant's version, as noted, was that he sold Cain narcotics on two occasions because Cain begged him. Particularly in view of the Clarke testimony about how one ounce of heroin that can be "stepped on once" is broken down into about 60 retail street sales, defendant needed to explain why he sold a commercial inventory for retail consumption.

Defendant testified on direct examination that he was "familiar" with Cain's habit, Cain was "using about 70 to a hundred dollars a day," and could "consume half a piece [one-half ounce] within a week." Cain's wife Mary was using about as much.

On cross-examination it developed that defendant had not seen either Claire or Mary Cain during the period from August 17 to October 17. The prosecutor moved to strike defendant's testimony concerning Claire and Mary Cain's use of narcotics. Further cross-examination by the prosecutor revealed that defendant's statements were based on what Cain told him on the phone. The court instructed the jury to disregard "any statement about what he thinks they were using during that period when he didn't see them every day."

The trial court erred. The only issue in this case was whether the idea to commit the crimes originated in the mind of the defendant or whether Cain induced him to commit them.

It was essential for defendant to convince the jury, first, that Cain repeatedly implored him to obtain heroin; second, that he thought that Claire and Mary Cain really needed heroin because they were addicts; and, third, that the large quantities furnished by defendant were justified by his belief that Cain and his wife had a very expensive habit—that one ounce would amount to only a week's supply. Whether in fact Cain had any habit at all is irrelevant; the issue was defendant's belief.

The error could have been particularly unfortunate in this case. The evidence clearly showed that defendant was a person who had been or possibly still was involved with heroin to some disputed extent. The instructions which the court was to give on the issue of entrapment emphasized the importance of the previous "innocence" of the alleged victim

of such police conduct. Thus in establishing his only defense, defendant had rather formidable factual, legal and psychological hurdles to overcome. To show that the police conduct, as he described it, fostered rather than prevented crime (*People* v. *Benford,* 53 Cal.2d 1, 9 [345 P.2d 928]), he had to depict himself as something other than an ordinary seller with a hair-trigger propensity to sell upon request. It was important that he be able to convince the jury that in furnishing heroin to Cain and his wife he acted out of human sympathy for a couple of addicts craving for their periodic doses, rather than from crass commercial motives.

Thus, undeniably the court's error went to the heart of defendant's case.

## III.

The jury was instructed that "[a] person is not guilty of a crime . . . when the idea to commit the crime did not originate in the mind of the defendant but originated in the mind of another and was suggested to the defendant . . . for the purpose of inducing defendant to commit the crime in order to entrap him and cause his arrest." (CALJIC No. 4.60 [1970 version].)

The jury was also instructed, presumably as a further explanation of CALJIC No. 4.60, that: "The request, by itself, of a law enforcement officer, or a person acting under the direction, suggestion or control of a law enforcement officer, of the defendant to sell heroin is not the type of act or conduct on the part of law enforcement officers or a person acting under the direction, suggestion or control of a law enforcement officer, which the law of entrapment was designed to cover."

Although this elaboration may be clear to a lawyer who reads it in the context of relevant authorities, it was too confusing for lay jurors.[2] Not surprisingly, after the jury had deliberated for a while, the foreman requested that the quoted instruction be reread. One juror said: "Judge, that last paragraph, that's what puzzled me. I can't get that through my head." The court then reread the instruction, and explained: "That is, a request directed to the defendant, asking him to sell heroin. That business itself is not the type of conduct which the law of entrapment was designed to cover." The juror was still perplexed: "Now the real question is, although it's not designed to cover it, does it in fact cover it?" The court then read

---

[2]The instruction probably was intended to state: "For the defense of entrapment to apply, you must find that the officer, or someone acting under the officer, did something more than simply ask the defendant to sell heroin."

a series of quotations from various cases which we set forth in the footnote.[3]

Defendant contends that the instructions given were confusing and contradictory. He particularly objects to the statement that the "law does not tolerate a person, . . . generating in the mind of a person who is innocent of any criminal purpose, the original intent to commit a crime, . . ." Defendant finds this explanation distinctively different from the basic instruction because of the phrase "innocent of *any* criminal purpose" (italics added). He contends that in view of his testimony that he took a spoon of heroin for his own use from each sale package, the jury could not have construed this phrase to include him as a potential victim of entrapment.

There is at least surface merit to defendant's claim. To instruct juries by the use of quotations from appellate opinions taken out of context is to court disaster. (*Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists*, 227 Cal.App.2d 675, 717-718 [39 Cal.Rptr. 64]; *People* v. *Hudgins*, 236 Cal.App.2d 578, 586 [46 Cal.Rptr. 199].)[4]

---

[3]". . . The facts are different in different cases. There are no two alike, and it's up to you to determine whether the instructions, as given, or these which are just explanatory, apply to your state of the facts.

" 'It is not the entrapment of a criminal upon which the law frowns, but the seduction of innocent people into a criminal career by its officers.'

" 'To determine whether entrapment has been established a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal.'

" 'Where the doing of an act is criminal regardless of the consent of anyone, and the original intent originates in the mind of the accused and the offense is completed, the fact that the officers furnishes the accused an opportunity to commit the crime and aids him in the commission thereof for the purpose of securing evidence necessary to prosecute him constitutes no defense.'

" 'There is no entrapment if the officers use no more persuasion than is necessary to an ordinary sale and the accused is willing to and does in fact make the sale.'

"The law does not tolerate a person, particularly a law enforcement officer, generating in the mind of a person who is innocent of any criminal purpose, the original intent to commit a crime, thus entrapping such person into the commission of a crime which he would not have committed, or even contemplated but for such inducement; and where a crime is committed as a consequence of such entrapment, no conviction may be had of the person so entrapped as his acts do not constitute a crime.

" 'If the intent to commit the crime did not originate with the defendant and he was not carrying out his own criminal purpose, but the crime was suggested by another person acting with the purpose of entrapping and causing the arrest of the defendant, then the defendant is not criminally liable for the acts so committed.' "

[4]Vacated and remanded on other grounds *sub nom. Hudgins* v. *California,* 386 U.S. 265 [18 L.Ed.2d 43, 87 S.Ct. 1035], affd. on remand, 252 Cal.App.2d 174 [60 Cal.Rptr. 176].

This is particularly true in any area, such as entrapment, where it would be idle to contend that the law is clear even to judges. (See *People* v. *Moran*, 1 Cal.3d 755 [83 Cal.Rptr. 411, 463 P.2d 763].)

## IV.

■ If this record presented a close case on entrapment—the only issue contested—the three errors discussed, particularly the striking of defendant's testimony, might well be prejudicial. In fact, however, the case against defendant was overwhelming. Leaving aside certain inherent improbabilities in his versions of the facts—such as his ability to obtain several hundred dollars worth of heroin on credit—the picture which he painted of himself is simply irreconcilable with uncontroverted evidence: three taped telephone conversations of October 17. All three were with Cain, and dealt with Cain's attempts to obtain heroin that night. The most damaging, perhaps, was the first, which we copy, in part, below.[5] All demonstrate that defendant was not a good Samaritan who had become persuaded to obtain narcotics for a "sick" friend, but a seller who refused to break up $250 worth of heroin when the amount offered was "a little out of [the friend's] line." Further, if defendant had obtained the amount he had at Cain's request, one would expect him to protest Cain's unwillingness or inability to take it off his hands. People who do not deal in heroin presumably do not relish exposing themselves to years in prison by possessing it, particularly if they still owe its price to their own supplier.

The record also contains a telephone conversation between Deputy Sheriff Consoli and defendant, taped two weeks after the October 17 sale,

---

[5] "R [Ramirez]: Yeah— [¶] C [Cain]: Hi—what's up—did you get a hold of anything yet? Or the town still dry? [¶] R: Well, no, I got a little bit. [¶] C: All I wanted tonight was just a couple of bags anyhow. [¶] R: Well, I'm going just on those halves —I got one-half— [¶] C: Half of what? [¶] R: Half a piece. [¶] C: Ye gods, half a piece? [¶] R: Yeah. [¶] C: That's a little out of my line tonight— [¶] R: Well, —— ■ C: How much is a half—half a piece? [¶] R: 250. [¶] C: 250. [¶] R: Yeah— I just happen to have one right now. [¶] C: Yeah, that's a little out of my line right at this present time. (Laughter.) [¶] C: Yeah. [¶] R: Well, it comes and goes— [¶] C: Huh? [¶] R: I said, it comes and goes— [¶] C: You can't get a couple of balloons, huh? [¶] R: I'd rather not break it up. [¶] C: Yeah—do you know anyone I can get just a couple from tonight then? . . . Yeah, let's see if I can find a half of a buyer for that half— . . . yeah, I know a friend of mine might want to buy— somebody was wanting a half of a piece there, I don't know if you know him, a guy named 'Sonny' you probably don't know him, but he was looking for some stuff but I don't know if he would want it or not. You want to—let's see, if I can find anybody that wants that [?] tonight, do you want to get rid of that? [¶] R: Yeah. [¶] C: I'll see—I'll have to go over and see this friend—all I want is a couple of bags myself. [¶] R: Sure. [¶] C: O.K.—I'll let you know whatever happens. [¶] R: O.K."

in which arrangements were made for Consoli to purchase an additional ounce of heroin. Nothing in that conversation gives the slightest hint that defendant was only willing to furnish heroin to friends in physical need.[6]

Defendant did not even attempt to explain the damning evidence of the tapes. He merely testified that the telephone conversations of October 17 were the last of a long series of such calls which he received on an almost daily basis from Cain, and that the half-ounce he had for sale at the time of the taped conversation had been obtained at Cain's request. With respect to the later conversation with Consoli, he testified that Consoli had called him several times after October 17th and asked him to obtain heroin. Defendant told Consoli that he owed him no favors, did not know him to begin with, and did not want to get involved with heroin—a ridiculous attempt to contradict the tape. Cross-examination of defendant concerning the tapes was surprisingly brief. Apparently the prosecutor did not feel that their irreconcilability with defendant's testimony needed stressing.

The errors were not prejudicial.

## V.

Finally, defendant contends that the court erred in refusing to give a requested instruction to the effect that if the jury was not satisfied beyond a reasonable doubt that defendant was guilty of the sales charged in the indictment, it could find him guilty of possession of heroin. Defendant points to evidence that when Cain called him on October 17, 1972, defendant said that he already had some heroin in his possession. That, however, seems to have been the heroin sold later that day. If there was error, it was cured by the verdict. (*People* v. *Sedeno*, 10 Cal.3d 703, 720-721 [112 Cal.Rptr. 1, 518 P.2d 913].) Moreover, the heroin was clearly possessed for sale at all times.

Principally defendant relies on the evidence that on the occasion of each sale he retained a small portion of the narcotic for himself. In theory, at least, the jury could have found that while defendant was entrapped into selling, he was predisposed, by reason of his own habit, to possess. (*People* v. *Goree*, 240 Cal.App.2d 304, 306 [49 Cal.Rptr. 392].)

Defendant's real problem is that the facts are almost identical with those in *People* v. *Francis*, 71 Cal.2d 66, 72-74 [75 Cal.Rptr. 199, 450 P.2d

---

[6]The admission of these conversations, though objected to at trial, is not raised as error on appeal. We do not imply that any attempt to do so would be successful. Their authenticity was never attacked.

591], where the Supreme Court pointed out that the lesser offense must be included "in fact," as well as in law. The heroin retained by defendant for his own use simply was not included in fact in the amount sold on the occasions charged in the indictment.

Further, we point out that, as requested by defendant,[7] the instruction was probably wrong. On the defense of entrapment, defendant himself had the burden of proof and the jury was so instructed. (*People* v. *Moran,* 1 Cal.3d 755, 760-761 [83 Cal.Rptr. 411, 463 P.2d 763].) Unless the jury disbelieved just about every witness who testified, including defendant, it had to be satisfied beyond a reasonable doubt that, barring entrapment, defendant was guilty as charged. No question concerning the lesser included offense of possession could possibly arise unless defendant established by a preponderance of the evidence that he was entrapped into selling.

The judgment is affirmed.

Ashby, J., and Loring, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 28, 1974.

---

[7]We appreciate that generally instructions on included offenses must be given *sua sponte.* (*People* v. *Hood,* 1 Cal.3d 444, 449-450 [82 Cal.Rptr. 618, 462 P.2d 370].)

*Assigned by the Chairman of the Judicial Council.