[No. A130641. First Dist., Div. Two. Dec. 22, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
SAMUEL CARL HUNTER, Defendant and Appellant.

## COUNSEL

David D. Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Christopher J. Wei, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**KLINE, P. J.**—After a one-day jury trial, appellant was convicted of three counts of second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c)),[1] and a single count of second degree commercial burglary (§§ 459, 460, subd. (b)). The jury also found appellant had used a firearm in the commission of three of the four offenses. (§ 12022.53, subd. (b).) The court sentenced appellant to a total prison term of 13 years, including the mandatory 10-year consecutive sentence for the firearm enhancement.

At the commencement of trial defense counsel advised the court that appellant admitted the charged robberies and burglary "and we're only challenging the gun. [¶] I don't anticipate putting on any witnesses that will talk about the gun that was allegedly used. What I am going to be arguing is this lack of evidence to show that it is a real gun."

After the presentation of evidence was completed, the prosecutor requested a "pinpoint instruction" telling the jury that the inability of appellant's victims to say conclusively that the "gun" he used in the commission of the crimes was real "does not create a reasonable doubt as a matter of law that the gun was not a firearm." Over appellant's objection, the court gave the proposed instruction.

Appellant contends that the giving of the challenged instruction directed a verdict for the prosecution with respect to the use of a firearm and is therefore reversible per se. At the very least, he alternatively argues, the instruction impermissibly lightened the prosecution's burden of proving the firearm use allegation, and that error is prejudicial under the harmless beyond a reasonable doubt standard set forth in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. We shall conclude that the instruction is not reversible per se because it did not direct the verdict, but that it did impermissibly lighten the prosecution's burden to prove the use allegation beyond a reasonable doubt and therefore should not have been given. However, because the error was not prejudicial under the applicable *Chapman* standard, we shall affirm the judgment.

## FACTS AND PROCEEDINGS BELOW

On the evening of January 28, 2008, appellant and Slava McDonald entered a branch bank located in a Raley's supermarket in Antioch. McDonald slammed a gun on the counter, pointed it at the two tellers, Linda Pineda and Matthew Rybolt, and demanded money. At the same time, appellant lifted his shirt, exposing a gun with a black handle tucked in his waistband.

---

[1] All subsequent statutory references are to the Penal Code.

Pineda testified that appellant's gun appeared to her to be real, not a "fake gun." She drew that conclusion because it looked "hard," like the gun her mother, a police officer, sometimes brought home. Rybolt focused only on McDonald's gun, describing it as a "revolver" having a "cylinder."

When the tellers said they had no access to money, McDonald told them to get the manager. Pineda then informed her supervisor, Christina Burton, and the branch manager, Allissa Flenoid, that the bank was being robbed. Flenoid testified that when she approached appellant and McDonald, the latter pointed a "little silver gun." Appellant was holding a gun on the counter. Flenoid described this gun as black in color, not "an old western style gun" like the one McDonald used but similar to the weapon in the holster of the bailiff in the courtroom. When McDonald demanded money, Flenoid gave him about $1,500 she took from a drawer. During this time, appellant and McDonald walked back and forth in front of Flenoid's office and she was able to see appellant's weapon. When asked by the district attorney whether she thought it was a real gun, Flenoid answered "yes." She also stated that nothing "about that gun made [her] believe it was a fake gun." Flenoid's entire encounter with the robbers lasted about 10 minutes.

Christina Burton also saw both of the robbers' guns, which they banged several times on the counter. She too believed appellant's gun was real and also that it was loaded, as it appeared to her to be a heavy metal object and there was nothing about it indicating it might not be a real gun. When, during cross-examination, defense counsel asked, "you really aren't able to determine a real gun from a fake gun; would that be fair to say?," Burton answered, "I think that for the most part I could be able to tell the difference. I mean, my kids have fake ones at the house, so I know what that looks like." Burton had also seen other "fake type guns," such as BB guns and "a fake lighter gun." She stated that "the way they were holding [the guns] and how they were using the guns" is what made her believe that the gun was real.

Appellant was not apprehended until June 2009, almost 18 months after the robberies. Detective Santiago Castillo of the Antioch Police Department interviewed appellant after his arrest and a video of the interview was received in evidence and played to the jury, as was a surveillance video showing some portions of the robbery as it occurred.

After Castillo read him his *Miranda*[2] rights, appellant waived them and admitted he committed the charged robberies, but said the gun he used was a "slider" that was "broke," while McDonald's gun was "like an antique," a "Winchester almost or something like that," and, "I don't even know if it was

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

a toy or what." After the robbery, appellant gave his gun, which he referred to as his "heat," to a friend named "T." The gun was not found by the police at one of the two addresses at which appellant said he resided; the police apparently did not search the other residence he identified. At no time during his interview with Castillo did appellant suggest that the gun he used was a "fake" or a "toy." The only reference appellant made to a "toy" gun related to McDonald's weapon.

Castillo had often arrested persons for offenses involving firearms and was cognizant of the terminology they and others used in referring to them. According to Castillo, most arrestees do not refer to their weapons as "guns" but use "street terms," such as "heat," the word appellant used to describe the gun he used in the robberies. When asked what he thought such persons meant by "heat," Castillo answered: "[a] loaded firearm." Castillo had never heard an arrestee or anyone else refer to a toy gun as "heat."

By consulting records maintained by the Automated Firearms System administered by California's Department of Justice, Castillo learned that two semiautomatic pistols were registered to appellant. Appellant purchased one of them, a nine-millimeter Beretta model M9, on July 22, 2006, about a year and a half before commission of the charged offenses.

Asked to explain the difference between a revolver and a pistol, Castillo said a revolver "is your old western cowboy style gun" with a "revolving cylinder in the middle." Semiautomatics are "more blocky, squared" and have no external cylinder. "One of the differences between a revolver and a semiautomatic," Castillo said, "is that once a bullet has been fired out of a revolver, the cylinder retains the casing which is what houses the bullet or cartridge. And in a semiautomatic, once that bullet has been fired, the gun ejects the casing." A semiautomatic pistol has a "rail" on top. When the weapon is fired, a "slide" running along the rail moves back, ejecting the spent casing and loading another bullet into the chamber. Both pistols registered to appellant had such a slide. When interviewed by Castillo, appellant described the weapon he used during the robberies on January 28, 2008, as having a "slide."

Appellant presented no witnesses. After deliberating for about an hour and a half, the jury found appellant guilty of all charges. The jury also found true the allegation that in the commission of three of the four charged offenses appellant used a "firearm" within the meaning of section 12022.53, subdivision (b), as required to subject him to the 10-year enhancement authorized by that statute.

On December 3, 2010, appellant was sentenced to a prison term of three years on the first robbery count, plus a consecutive term of 10 years on the arming enhancement. Sentences on the remaining counts were made concurrent.

Appellant filed a timely notice of appeal three days later.

## DISCUSSION

The "pinpoint instruction" requested by the prosecution and given by the court stated as follows: "When a defendant commits a robbery by displaying an object that looks like a gun, the object's appearance and the defendant's conduct and words in using it may constitute sufficient circumstantial evidence to support a finding that it was a firearm. The victim's inability to say conclusively that the gun was real and not a toy does not create a reasonable doubt as a matter of law that the gun was a firearm."

Objecting to the instruction, defense counsel pointed out that the language of the opinion in *People v. Monjaras* (2008) 164 Cal.App.4th 1432, 1437 [79 Cal.Rptr.3d 926], from which the instruction was taken, had nothing to do with instructions to the jury. The issue in the case was the sufficiency of the evidence for the jury to infer that the defendant's weapon was real and thus a "firearm" within the meaning of section 12001. The purpose of the language used here to instruct the jury was simply to make sure that jurors were not required to give a defendant the benefit of the victim's inability to say conclusively that the pistol used in the crime was a real firearm. (164 Cal.App.4th at p. 1436.) Adopting the language as a jury instruction, counsel argued, essentially created an unfair and unreasonable presumption that the gun used by appellant was a real gun, which the *Monjaras* court never intended.

The trial court disagreed, stating that "the pinpoint instruction is taken exactly from the language of Justice Scotland. . . . And I'm going to follow it."

The questions presented, which we address in turn, are: (1) whether the instruction directed the verdict and is therefore reversible error per se; (2) if it did not direct the verdict, whether it was nevertheless error to give the instruction; and (3) if so, whether the error was prejudicial.

*Because the Challenged Instruction Did Not Even Partially Direct the Verdict, Giving It Could Not Be Reversible Error Per Se*

The California Supreme Court has observed that the proper standard for assessing prejudice from instructional error that relieves the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense has been evolving for many years and "remains uncertain under California and federal law." (*People v. Flood* (1998) 18 Cal.4th 470, 479–480 [76 Cal.Rptr.2d 180, 957 P.2d 869] (*Flood*).) The harmless beyond a reasonable doubt test set forth in *Chapman v. California, supra*, 386 U.S. 18, has increasingly "limited, but not eliminated, the categories of reversible error per se analysis. If a defendant was convicted following a trial, at which he or she was represented by counsel and could present evidence and argument before an impartial judge and jury, and the court did not direct a verdict for the prosecution, there is a strong presumption that any other errors that may have occurred are subject to harmless error analysis rather than reversible error per se." (6 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Reversible Error, § 21, p. 475; see also *Flood, supra*, 18 Cal.4th 470; *People v. Lee* (1987) 43 Cal.3d 666, 674–676 [238 Cal.Rptr. 406, 738 P.2d 752]; *People v. Barbosa* (1991) 228 Cal.App.3d 1619, 1628–1631 [279 Cal.Rptr. 626].)

The most recent exposition and distillation of the governing principles by our Supreme Court is set forth in *Flood*, in which the defendant was convicted of evading a vehicle operated by a pursuing peace officer, resulting in serious bodily injury (Veh. Code, § 2800.3). To establish that offense, the prosecution was required to prove, among other things, that the vehicle the defendant was attempting to elude was operated by a "peace officer," as defined in section 830.1, subdivision (a), and that the peace officer was wearing a distinctive uniform, as required by Vehicle Code section 2800.1, subdivision (a)(4). In instructing on the elements of the offense, the trial court failed to advise the jury that it had to determine whether those in the pursuing vehicle were "peace officers"; instead, it told the jury that the officers in that vehicle *were* peace officers, thus removing that element from the jury's consideration.

*Flood* rejected application of a rule of automatic reversal in this situation, for *purposes of California law*, holding that the prejudicial effect of the error was to be determined under the harmless error provision embodied in article VI, section 13 of the California Constitution, which directs that "[n]o judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." *Flood* explained that "misdirection of the jury" encompasses " ' "every kind of instructional

error," ' " including " ' "incorrect, ambiguous, conflicting, or wrongly omitted instructions." ' " (*Flood, supra,* 18 Cal.4th at p. 487, quoting *People v. Wims* (1995) 10 Cal.4th 293, 314–315 [41 Cal.Rptr.2d 241, 895 P.2d 77].) "[I]nstructional errors that have the effect of removing an element of a crime from the jury's consideration encompass a broad spectrum of circumstances and may be assessed in the context of the evidence presented and other circumstances of the trial to determine whether the error was prejudicial." (*Flood,* at p. 489.)

After finding the error harmless under the applicable *Watson* standard of review (*People v. Watson* (1956) 46 Cal.2d 818, 836–837 [299 P.2d 243]), the *Flood* court was obliged to determine whether the error was reversible per se under the federal Constitution (*Flood, supra,* 18 Cal.4th at p. 491). To do so, *Flood* analyzed a line of United States Supreme Court cases commencing with *Rose v. Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101], which announced the general rule that "if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis. The thrust of the many constitutional rules governing the conduct of criminal trials is to ensure that those trials lead to fair and correct judgments. Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed." (*Rose v. Clark,* 478 U.S. at p. 579; see *Flood,* at p. 492.) *Rose v. Clark* held that harmless error analysis could be applied to an erroneous instruction creating a rebuttable presumption of malice and thereby impermissibly lightening the prosecution's burden of proof on the element of malice. (*Rose v. Clark, supra,* 478 U.S. at p. 580.)

*Yates v. Evatt* (1991) 500 U.S. 391 [114 L.Ed.2d 432, 111 S.Ct. 1884], overruled on other grounds in *Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385, 112 S.Ct. 475], reiterated that the applicable test is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (*Yates v. Evatt,* at p. 403, quoting *Chapman v. California, supra,* 386 U.S. at p. 24.) A conclusion that the error did not contribute to the verdict may be made, *Yates* held, when "the force of the evidence presumably considered by the jury in accordance with the instructions [independently of the improper presumption] is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the presumption." (*Yates v. Evatt,* at p. 405.)

*Arizona v. Fulminante* (1991) 499 U.S. 279 [113 L.Ed.2d 302, 111 S.Ct. 1246], involving a coerced confession, distinguished between " 'trial error'— error which occurred during the presentation of the case to the jury, and

which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt"—and "structural" error—"defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." (*Id.* at pp. 307–308, 309.) *Fulminante* noted that instructional errors have often been treated as "trial error" subject to harmless-error analysis. (*Id.* at pp. 306–307, citing as examples *Clemons v. Mississippi* (1990) 494 U.S. 738, 752–754 [108 L.Ed.2d 725, 110 S.Ct. 1441], *Carella v. California* (1989) 491 U.S. 263, 266 [105 L.Ed.2d 218, 109 S.Ct. 2419] and *Rose v. Clark, supra,* 478 U.S. 570.)

■ Based on its analysis of these and other Supreme Court cases, and lower court cases applying them, *Flood* concluded that "an instructional error that improperly describes or omits an element of an offense, or that raises an improper presumption or directs a finding or a partial verdict upon a particular element, generally is not a structural defect in the trial mechanism that defies harmless error review and automatically requires reversal under the federal Constitution. Indeed, the high court never has held that an erroneous instruction affecting a single element of a crime will amount to structural error . . . and the court's most recent decisions suggest that such an error, like the vast majority of other constitutional errors, falls within the broad category of trial error subject to *Chapman* review." (*Flood, supra,* 18 Cal.4th at pp. 502–503, citation omitted.)

Alert to the problem *Flood* presents him, appellant maintains that the issue he raises was not decided in that case, emphasizing that the *Flood* court explicitly declined "to decide whether there may be some instances in which a trial court's instruction removing an issue from the jury's consideration will be the equivalent of failing to submit the entire case to the jury—an error that clearly would be 'structural' rather than a 'trial' error." (*Flood, supra,* 18 Cal.4th at p. 503.) As appellant sees it, the effect of the instruction here at issue was to remove from the jury's consideration *the entire question* whether he could be subjected to "an additional and consecutive term of imprisonment in the state prison for 10 years" for personally using a "firearm" in the commission of the offenses he admitted. (§ 12022.53, subd. (b).)

The public defender and district attorney who tried this case certainly did not believe the instruction had that effect.

At the outset of her closing argument, appellant's trial counsel acknowledged that where "a defendant commits a robbery by displaying an object that looks like a gun, the object's appearance and the defendant's conduct and words in using it may constitute sufficient circumstantial evidence to support a finding that it was a firearm. [¶] The emphasis I want to put on there is it

may." Conceding jurors could use the surveillance video of the offenses taking place and other evidence to find "circumstantial evidence to prove it was a real gun," counsel stressed that "you're not required to do that. And the reason you're not required to do that is because of common sense because we need to—you need to evaluate and scrutinize [the evidence.]"

At that point, referring to the instruction at issue, defense counsel told the jury that the statement that "[t]he victims' inability to say conclusively that the gun was real and not a toy does not create a reasonable doubt as a matter of law that the gun was a firearm" meant that "nothing is automatic. So you can't say because the witness said, 'I can't tell a fake gun from a real gun,' you can't automatically find that that is reasonable doubt. You have to evaluate everything. . . . You must consider everything and take everything into account when deciding whether it was a real gun." Counsel explained to the jury that because the percipient witnesses were unable to conclusively determine whether the gun was real or fake, jurors themselves had to do so, and this duty imposed on them a responsibility to closely examine all of the relevant evidence bearing on the authenticity of appellant's gun.

Defense counsel then commenced to examine "each piece of evidence that the prosecution presented and highlight to you the issues that I think are important for you to identify," arguing that the prosecution's evidence was "just not enough" to establish that the gun was real. Among many other things, counsel contended, the surveillance video, a photograph of appellant's gun received in evidence, and the fears described by the victims were insufficient to show that the gun was real. Defense counsel also emphasized various weaknesses in the testimony of the prosecution's witnesses. She pointed out the discrepancy between the clothes Pineda said appellant was wearing and those shown in the video, Pineda's inability to identify McDonald in a photo lineup shortly after the robbery, Pineda's statement that the gun appellant used was entirely black whereas the photo showed that only the handle was black, and the fact that Pineda had seen her mother's gun only "twice" and was admittedly unfamiliar with firearms. Defense counsel argued that Burton's recollection of appellant's gun was shown to be unreliable by her uncertainty about its color and the fact she could not identify appellant in a photo lineup. Flenoid's testimony was manifestly unreliable, counsel argued, because her certainty that McDonald's gun was not a revolver conflicted with the surveillance video, she was unable to determine whether appellant's gun was metal or plastic, and she conceded appellant could have been using a fake gun. Counsel also emphasized that although Detective Castillo provided "a substantial list of replica firearms that he has seen in his experience" he never asked appellant whether his gun was real, seeming to focus instead on the gun McDonald used. Furthermore, defense counsel stressed, Castillo never searched one of the two residences at which appellant lived, though he had the address.

The district attorney, who placed little emphasis on the challenged instruction, fully agreed with defense counsel that the jury received considerable evidence regarding the authenticity of appellant's gun and was required to review it carefully. Focusing upon the portion of the instruction on circumstantial evidence that the public defender had emphasized—"If you can draw two or more reasonable conclusions from the circumstantial evidence and one of those reasonable conclusions points to innocence and another to guilty, you must accept the one that points to innocence"—the district attorney told the jurors that the public defender had left out "the very next sentence in that instruction which is: You must only accept reasonable conclusions. And you must reject unreasonable conclusions." The thesis of the district attorney's closing was that the only reasonable conclusion they could draw from the relevant evidence was that appellant's gun was real.

The district attorney stressed the high level of anxiety and fear expressed by all of the victims during the robbery, arguing that it was compatible only with the belief appellant and McDonald were brandishing "real guns." She also noted that the discrepancies between the witnesses the defense emphasized were few, trivial, and unremarkable, given that people confronted with what appear to be loaded guns pay little attention to the color of the clothes the gunmen are wearing. The district attorney also invoked common sense, pointing out that "[i]t isn't reasonable to infer he's going to go into a bank and get this close . . . to the people he's trying to take money from, show them a gun, put it on the counter . . . touch hard objects with it if it's a fake." The witnesses all said the gun "looked like metal" and "defendant himself referred to it as a gun. . . . He didn't say it was plastic. He didn't say it was a toy," he described it as having a "slide" and also referred to it as "heat." "It's unreasonable to think that anyone, much less a person who has knowledge of guns . . . would ever consider a toy gun heat." She also called attention to appellant's registration of two semiautomatic weapons that each had a "slide," as did the gun appellant described to Detective Castillo.

The district attorney also pointed out that the video provided direct, not circumstantial, evidence that the gun was real. As she told the jury, "you have evidence in the form of the video. And in the video you see movement. You see the way the gun looks when it comes over the high counter. You see the way the gun looks when he has it down. You actually can see the gun on the video. You have pictures."

The closing arguments of counsel reveal that neither the defense nor the prosecution believed that, as appellant now claims, the challenged instruction removed from the jury the entire question whether he personally used a "firearm" in the commission of the offenses he admitted. As the arguments of counsel explained, the inability of the witnesses to conclusively determine

whether appellant's gun was real or fake was by no means the only evidence in this case bearing upon that issue, nor was it the most probative.

Appellant's reliance on *People v. Yarbrough* (2008) 169 Cal.App.4th 303 [86 Cal.Rptr.3d 674] (*Yarbrough*) is unavailing. In that case a jury convicted the defendant of carrying a loaded firearm in a public place in violation of section 12031, subdivision (a)(1). During jury deliberations the jury submitted written questions to the court: " 'To be found guilty of [the offense of carrying a loaded firearm in a public place]: (1) must the defendant be on the sidewalk, or (2) is being on the driveway sufficient? (3) Define public place for us.' After consulting with counsel, the court provided the jury with the following response: '(1) No. (2) Yes. (3) The area in front of a home, including a private driveway, is a public place if it is reasonably accessible to the public without a barrier.' " (169 Cal.App.4th at pp. 314–315.)

The question in *Yarbrough* was whether the instruction directed a verdict for the prosecution on the element of a "public place" in section 12031, subdivision (a). Using language seized upon here by appellant, *Yarbrough* agreed with the defendant "that the constitutional right to a jury trial means that 'no matter how conclusive the evidence, a trial court cannot directly inform the jury that an element of the crime charged has been established. Absent a stipulation by the defendant that an element is established or is admitted, the trial court must submit that question to the jury.' [Citations.] ' "The prohibition against directed verdicts 'includes perforce situations in which the judge's instructions fall short of directing a guilty verdict but which nevertheless have the effect of so doing by eliminating other relevant considerations if the jury finds one fact to be true.' [Citation.] . . . '[N]o fact, not even an undisputed fact, may be determined by the judge.' [Citations.]" [Citation.]' [Citations.] '[I]t matters not whether the issue in question is one of fact or law. Due process requires that it be submitted to the jury.' [Citation.]" (*Yarbrough, supra*, 169 Cal.App.4th at p. 315.)

The foregoing principles were *not* violated by the instruction in the present case because it did not inform the jury that an element of the crime charged—or, more precisely, the truth of the allegation that appellant used a "firearm" in the commission of the admitted offenses—had been established. It simply told jurors that one of the many relevant considerations bearing upon that issue, the victim's inability to conclusively say that the gun appellant used was real, did not necessarily compel the jurors to find the use allegation untrue under the reasonable doubt standard. The instruction did not, in other words, usurp the jury's factfinding function. Although appellant declined to present any evidence that his gun was fake, the trial judge did not in any way prevent him from doing so.

Appellant also ignores the actual ruling in *Yarbrough*. The court noted that the trial court "directly advised the jury that a guilty verdict did not require proof that defendant was on the sidewalk," and that the remainder of the court's response "effectively instructed the jury that defendant's presence on the private driveway was sufficient to prove guilt, but only if the driveway was 'reasonably accessible to the public without a barrier.' " (*Yarbrough, supra*, 169 Cal.App.4th at pp. 315–316.) The *Yarbrough* court could "discern nothing in the response that usurped the jury's factfinding function. The court did not instruct the jury to find that the driveway was a public place for purposes of Penal Code section 12031. [Citations.] Instead, the instruction left the jury with the task of making two essential factual determinations based upon the evidence as a prerequisite to a guilty verdict on count 2: first, that defendant was on the driveway; and second, that the driveway was reasonably accessible to the public. The instruction . . . did not remove any issue of fact from the jury or direct a verdict for the prosecution." (*Id.* at p. 316.) Nor did the instruction at issue in this case do so. Although, as we explain, the instruction should not have been given, the ideas it expressed were based on the assumption that the jury had to determine whether the evidence produced by the prosecution constituted sufficient evidence to support a finding that the object appellant displayed was a firearm. That was the chief issue in this case, and the jury decided it, not the court.

The factors that accounted for the rejection of per se reversal in *Rose v. Clark, supra*, 478 U.S. 570, and *Flood, supra*, 18 Cal.4th 470, are all present in this case. Appellant received a full opportunity to present evidence and argument that he did not use a firearm, and he was tried by a fairly selected, impartial jury that was supervised by an impartial judge. Apart from the challenged instruction, the jury was properly instructed that it had to find appellant guilty, and the use allegation true, beyond a reasonable doubt. As we next explain, the giving of the challenged instruction does constitute error, but that error—which, unlike structural errors, can be fairly evaluated from the record—cannot be compared with the kinds of errors that automatically require reversal of an otherwise valid conviction.

 Because the challenged instruction did not remove from the jury's consideration the entire question whether appellant could be subjected to "an additional and consecutive term of imprisonment in the state prison for 10 years" for personally using a "firearm" in the commission of the robberies he admitted (§ 12022.53, subd. (b)), it did not in any respect direct the verdict, and the giving of the instruction is therefore not reversible per se.

*The Instruction Impermissibly Lightened the Prosecution's Burden of Proof*

 The Attorney General asserts that the instruction proposed by the district attorney "properly pinpointed the theory of the defense" and merely

"charged the jury on how to relate the evidence of that defense to the prosecution's general burden of proving guilt beyond a reasonable doubt." This is a strange statement. It is true that a trial court may in appropriate circumstances give a requested jury instruction that pinpoints a defense theory of the case by, among other things, relating the reasonable doubt standard of proof to particular elements of the crime charged. (See, e.g., *People v. Bolden* (2002) 29 Cal.4th 515, 558 [127 Cal.Rptr.2d 802, 58 P.3d 931].) But the Attorney General cites no case, and it would be surprising if there were one, authorizing the giving of a prosecution instruction pinpointing the defense theory over the objection of the defense. Moreover, the instruction in this case did not pinpoint a defense theory. If it "pinpointed" anything, it was a legal theory that favored the prosecution by restricting the use of circumstantial evidence to raise a reasonable doubt.

Aside from *People v. Monjaras, supra*, 164 Cal.App.4th 1432, from which the language of the challenged instruction was derived, the Attorney General relies upon *People v. Wimberly* (1992) 5 Cal.App.4th 773 [7 Cal.Rptr.2d 152] and *People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285 [3 Cal.Rptr.2d 808] to show that the instruction was properly given. These cases are manifestly inapposite. The instructions at issue in *Wimberly* and *Fitzpatrick* (CALJIC No. 2.03 in *Wimberly* and CALJIC No. 2.06 in *Fitzpatrick*) were form instructions, not ones claimed to "pinpoint" a defense theory, and neither adverted to the determination of reasonable doubt.[3]

There are two problems with the challenged instruction.

The first is that the initial sentence is unduly argumentative. The instruction begins, "[w]hen a defendant commits a robbery by displaying an object that looks like a gun, the object's appearance and the defendant's conduct and words in using it may constitute sufficient circumstantial evidence to support a finding that it was a firearm." But the jury could just as accurately have been told the opposite, that when a defendant displays an object that looks

---

[3] District attorneys are sometimes said to have the right to request "pinpoint instructions," but the instructions at issue invariably clarify or amplify standard instructions or limiting instructions, like those involved in *People v. Wimberly, supra*, 5 Cal.App.4th 773 and *People v. Fitzpatrick, supra*, 2 Cal.App.4th 1285. (See, e.g., *People v. Moore* (1954) 43 Cal.2d 517, 526 [275 P.2d 485]; *People v. Dennis* (1998) 17 Cal.4th 468, 532 [71 Cal.Rptr.2d 680, 950 P.2d 1035]; *People v. Pride* (1992) 3 Cal.4th 195, 249 [10 Cal.Rptr.2d 636, 833 P.2d 643]; *People v. Hernández Ríos* (2007) 151 Cal.App.4th 1154, 1157 [60 Cal.Rptr.3d 591]; *People v. Napoles* (2002) 104 Cal.App.4th 108, 117 [127 Cal.Rptr.2d 777]; *People v. Reyes* (1987) 195 Cal.App.3d 957, 965–966 [240 Cal.Rptr. 752].)

like a gun, the object's appearance and the defendant's conduct may constitute sufficient circumstantial evidence to support a finding *that it was not a firearm.*

■ The second and more serious problem is constitutional. Under the Fifth Amendment, the prosecution must prove every element of a criminal offense beyond a reasonable doubt (*Patterson v. New York* (1977) 432 U.S. 197, 210 [53 L.Ed.2d 281, 97 S.Ct. 2319]), and the Sixth Amendment requires that determination to be made by the jury, not the court (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 476 [147 L.Ed.2d 435, 120 S.Ct. 2348]). Consequently, an instruction lightening the prosecution's burden of proof violates the accused's right to a jury trial. (See, e.g., *United States v. Gaudin* (1995) 515 U.S. 506, 519 [132 L.Ed.2d 444, 115 S.Ct. 2310]; *Flood, supra,* 18 Cal.4th at p. 482; *People v. Reyes Martinez* (1993) 14 Cal.App.4th 1412, 1417 [18 Cal.Rptr.2d 300].)

In order for the court to impose on appellant the 10-year sentence enhancement mandated by section 12022.53, subdivision (b), the prosecution was required to prove beyond a reasonable doubt that the object appellant used, which looked like a gun, was a "firearm" under that statute. As we have said, the challenged instruction did not direct the jury that it *could not* find a reasonable doubt whether the gun was real based on the victims' inability to "say conclusively that the gun was real and not a toy." But the instruction did highlight this one aspect of the evidence as not necessarily creating a reasonable doubt, thereby permitting the jurors to interpret the instruction as a caution against finding a reasonable doubt on this basis.

■ Despite section 1096a, which declares that when the statutory definition of reasonable cause (set forth in § 1096) is given to the jury, no other reasonable doubt instruction need be given, "*a defendant,* upon proper request therefor, *has a right* to an instruction that directs attention to evidence from a consideration of which a reasonable doubt of his guilt could be engendered." (*People v. Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847], italics added.) Accordingly, the commentary to the standard reasonable doubt instruction (CALCRIM No. 220), entitled "Pinpoint Instruction on Reasonable Doubt," states that *a defendant* is entitled, on request, to an instruction pinpointing " 'the specific evidence on which the theory of the defense "focuses" which is related to reasonable doubt.' " (Judicial Council of Cal., Crim. Jury Instns. (2011) Related Issues to CALCRIM No. 220, pp. 48–49, quoting *People v. Adrian* (1982) 135 Cal.App.3d 335, 338 [185 Cal.Rptr. 506].) The challenged instruction did not direct attention to evidence from a consideration of which a reasonable doubt of appellant's guilt could be

engendered. On the contrary, as we have indicated, it directed attention to the very opposite: evidence from a consideration of which a reasonable doubt of his guilt could *not* be engendered. Needless to say, the giving of an instruction suggesting that evidence received by the court and properly before the jury is insufficient to create reasonable doubt about an issue the district attorney was required to prove is manifestly impermissible.

The fact that the instruction at issue was "taken directly" from the opinion in *People v. Monjaras, supra,* 164 Cal.App.4th 1432, certainly does not, as the Attorney General argues, justify its use as an instruction. Presiding Justice Scotland's opinion in *Monjaras* was directed solely at the sufficiency of evidence from which a jury may infer that a gun used in the commission of an offense was a "firearm" within the meaning of section 12022.53, subdivision (b). The case had nothing to do with jury instructions. The fact that the purpose of the opinion in *Monjaras* was "to say in no uncertain terms that a moribund claim like that raised by defendant has breathed its last breath" (*Monjaras,* at p. 1435), to which the Attorney General attaches significance, is irrelevant. Appellant has never claimed that the personal use allegation under section 12022.53, subdivision (b), cannot be " 'sustained merely on conjecture about the nature of the alleged weapon' " (*Monjaras,* at p. 1435), which was the "moribund claim" advanced in *Monjaras.* His assertion that the instruction was prejudicial embodies a different claim: that the use of circumstantial evidence relevant to the authenticity of a gun used in the commission of a crime must be left entirely to the jury. As indicated, the proposition for which *Monjaras* stands, that "[c]ircumstantial evidence alone is sufficient to support a finding that an object used by a robber was a firearm" (*id.* at p. 1436, citing *People v. Green* (1985) 166 Cal.App.3d 514, 516–517 & fn. 1 [212 Cal.Rptr. 451]), does not exclude the possibility that circumstantial evidence alone may be *insufficient* to support a finding that an object used by a robber was a firearm.

■ The challenged instruction was given in this case because, as in *People v. Colantuono* (1994) 7 Cal.4th 206 [26 Cal.Rptr.2d 908, 865 P.2d 704], the trial judge much too quickly assumed "that a correct statement of substantive law will provide a sound basis for charging the jury." (*Id.* at p. 221, fn. 13; accord, *People v. Adams* (1987) 196 Cal.App.3d 201, 204–205 [241 Cal.Rptr. 684] ["Language in an appellate court opinion which may be a good statement of law or of the reasoning of the appellate court does not necessarily make a good jury instruction."]; see *People v. Smith* (1989) 214 Cal.App.3d 904, 912–913 [263 Cal.Rptr. 155]; *People v. Ramirez* (1974) 40 Cal.App.3d 347, 355 [114 Cal.Rptr. 916]; *People v. Hudgins* (1967) 252 Cal.App.2d 174, 183 [60 Cal.Rptr. 176]; *People v. Odom* (1937) 19 Cal.App.2d 641, 649 [66 P.2d 206].) But, as this case shows, "[t]he discus-

sion in an appellate decision is directed to the issue presented. The reviewing court generally does not contemplate a subsequent transmutation of its words into jury instructions and hence does not choose them with that end in mind." (*People v. Colantuono*, at p. 221, fn. 13.) For this reason, our Supreme Court has strongly cautioned "that when evaluating special instructions, trial courts carefully consider whether such derivative application is consistent with their original usage." (*Ibid.*) The trial judge in this case neglected to make that necessary inquiry.

### The Error Was Not Prejudicial

There can be no doubt, and appellant comes close to conceding the point, that no reasonable juror in this case could have concluded the object appellant used in the commission of his offenses was a toy gun or a replica and not a "firearm" within the meaning of section 12022.53, subdivision (b).

As the relevant evidence has already been described, suffice it for us to note that appellant offered no evidence, and there was none from which it could reasonably be inferred, that the gun was a toy or replica. None of the victims thought the weapon brandished by appellant was a fake or toy gun, or anything other than what it appeared to be. Nor did anything in the video of the robbery or photograph of the gun indicate that the apparent handgun appellant used was actually fake. Nothing in appellant's statements to Detective Castillo suggested in the slightest that the object he showed his victims and threateningly brandished was either a fake or a toy. While appellant said the "gun" his partner, McDonald, used "could have been a toy," he never said that about his own gun.

A plethora of other evidence also supported the conclusion that appellant used a firearm: appellant repeatedly referred to it as a "gun" or "heat" when talking to his victims and later to the police; it looked real; appellant's conspicuous brandishing of it and other conduct indicated it was not fake; appellant was intimately familiar with guns and possessed a registered semiautomatic weapon similar to the one he told Detective Castillo he used in committing the charged offenses.

For the foregoing reasons, we have no difficulty concluding that the erroneous giving of the challenged instruction to the jury was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. at p. 24.)

## DISPOSITION

The judgment is affirmed.

Haerle, J., and Richman, J., concurred.

A petition for a rehearing was denied January 13, 2012, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied April 11, 2012, S199742.