Filed 3/24/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br>Plaintiff and Respondent,<br>v.<br>JOHN WESLEY SOUTHARD,<br>Defendant and Appellant. | A157236<br><br>(Del Norte County Super.<br>Ct. No. CRF-19-9002) |

Defendant John Wesley Southard was involved in two traffic stops a week apart in December 2018, the first as a driver in a pickup truck, the second as a passenger in a car driven by a friend. As a result of defendant's interaction with officers from the California Highway Patrol (CHP) and the Crescent City Police Department, he was charged with seven counts of obstructing a peace officer and forcible resistance of an officer—charges that require the People to prove the officers were acting lawfully—and one misdemeanor count of possession of methamphetamine. Following a relatively brief trial and relatively lengthy deliberations, defendant was convicted on all charges. He was sentenced to five years four months in prison, and also assessed thousands of dollars in fines.

Defendant's appeal makes five arguments, the first three of which assert instructional error, that the trial court: (1) gave a special instruction based on language from an appellate opinion that acted to remove the lawful performance element of the resisting charges; (2) gave CALCRIM No. 250

1

that acted to remove the knowledge element of the charged offenses; and (3) failed to give a unanimity instruction. We agree with defendant's first two arguments, and conclude the errors were prejudicial. We thus reverse the convictions without the need to address the remaining arguments. And we publish the opinion, to remind trial courts of the danger of instructing a jury with language from an opinion that has nothing to do with jury instructions.

## BACKGROUND

### Introduction

Defendant was charged with eight counts, seven of which were for forcible resisting arrest and obstructing a peace officer arising out of his conduct in traffic stops on December 18 and December 25, 2018. Three officers testified about what occurred at the first stop, one of whom, Brenton Dunaj, testified over two days, giving testimony that was anything but consistent. Indeed, at one point in his briefing, the Attorney General himself describes the officer's testimony as "admittedly confused," such that "the potential existed for jurors to find an illegal detention"; at another point the Attorney General describes Dunaj's testimony as "confusing." The Attorney General's candor is spot on, as the examination of Dunaj revealed.

### The December 18 Incident

At about 3:00 a.m., CHP Officers Dunaj and Spencer Good were patrolling Highway 101 in an area where the highway is a two-lane road. Dunaj was driving. As their vehicle proceeded south, they observed a pickup truck heading north at about 35 miles per hour in a 55 mile per hour zone, while straddling the white line separating the roadway from the shoulder. Driving at a slow speed was not a traffic violation, as Highway 101 did not have a minimum speed limit in that area. However, Dunaj testified, driving

2

with tires over the line is a violation of the Vehicle Code. Moreover, because vehicles usually drive in the center of the lane at about the speed limit, the officers were suspicious the driver was under the influence.

When the pickup truck passed them, Dunaj made a U-turn and, as the prosecutor would describe him at trial, appearing a "little eager," said to Good: "Let's see what kind of trouble we can get into." And, Good added, the stop was to be consensual. After Dunaj turned around and began driving in the pickup's direction, the pickup pulled to the side of the road. Then Dunaj turned his lights on—which he admitted transformed the stop into a detention requiring reasonable suspicion—after which they noted that the registration was expired.

This is how the Attorney General's brief describes the setting: "Driving with an expired registration tags [*sic*] also violates the Vehicle Code. [Citation.] The officers discussed having a consensual encounter with the driver by not activating their lights, but after Officer Dunaj saw the expired registration tag, he effected a detention by activating them. Officer Good testified that even though driving over the white line made the officers suspect the driver was impaired, in a consensual encounter they would still be able to observe the driver for signs he was intoxicated such as a smell of alcohol or red, watery eyes. If the driver seemed to be impaired the officers would tell him he was being detained. [Citation.] . . . The officers had a reasonable suspicion the driver was impaired from the combination of the slow speed, driving over the white line, and the time of night. [Citation.]

"Based on the expired registration tag and his concern that the driver of the pickup truck was under the influence, Officer Dunaj activated his patrol car lights to direct the driver to pull over. [Citation.] . . .

"Officer Dunaj testified that his reason for activating his lights was for a violation of Vehicle Code section 21658 (requiring a driver to drive within a single lane), although that statute applies only to roadways with two or more lanes in one direction. [Citation.] In his report, Officer Dunaj did not list a violation of Vehicle Code section 21658. The first listed violation was Vehicle Code section 22107, because Officer Dunaj considered driving over the line marking the edge of the roadway to be an unsafe movement."

After being pulled over, defendant got out of the pickup. The officers ordered him to get back in. But defendant took off running, and ran approximately two hundred feet before he tripped and fell. Dunaj got on top of defendant to hold him down and Good arrived "within seconds." Deputy Wade Owen, who was responding to a call for assistance, testified that he saw Good and Dunaj chasing defendant, and it took him "a few seconds" after he stopped to catch up to the group. Dunaj used his taser to "drive-stun" defendant a number of times, and the officers then arrested defendant. Owen's body camera captured the incident.

On direct examination, Dunaj testified that defendant's right hand was free, and appeared to be reaching towards his right pocket in which two folding knives, each with a three-inch blade, were later found.[1] On cross-examination, Dunaj was shown Owen's body camera footage showing that, contrary to Dunaj's testimony and his report, he actually had defendant's right hand in a control hold the entire time. Dunaj then testified that defendant was reaching for his flashlight and possibly to his right pocket in the 10 to 20 seconds before Owen's arrival. Six pages later, Dunaj changed his testimony, testifying that defendant's hand was underneath his body, not visible, and he could not say if it was going towards defendant's right pocket.

[1] The knives were legal, and defendant never pulled them out.

4

Good testified that he observed defendant's left arm to be underneath his body. Owen testified that while defendant's hand was behind his back, it was unclear what he was specifically reaching for. He also testified that when he got there, Dunaj had defendant's right hand "out and to the side."

And despite Dunaj's testimony that they pulled defendant over for three purported Vehicle Code violations, Dunaj admitted that "only one of [them] seem[ed] to factually apply," and it was an "infraction."[2]

**The December 25 Incident**

On December 25, Christmas, defendant was, along with his minor son, a passenger in an older model Volvo driven by David Bonde. Defendant was in the front passenger seat, his son in the back. At a little after 7:00 p.m., CHP Officer Tyler Krueger observed that the license plate lights on the Volvo were not working, and pulled the car over in a supermarket parking lot. As Krueger approached the car, he recognized defendant, as he had heard "stories" about him, and was aware of the December 18 incident—knowledge, Krueger would come to testify, that affected how he dealt with defendant during the traffic stop.

Krueger asked Bonde for his license, registration, and insurance.[3] Krueger asked defendant for his full name and date of birth, and defendant asked why Krueger "was messing with" him. Krueger admitted he did not demand that defendant identify himself because at the point he was not aware of anything defendant had done wrong.

---

[2] To further add to the confusion, in their testimony, but not in the police reports, Dunaj and Good claimed they believed defendant may have been intoxicated.

[3] Bonde's license came back as suspended, a misdemeanor, but Krueger did not cite him.

5

Krueger testified he wanted to run a warrant check and hoped to keep the conversation calm while he did. Defendant told Krueger he had recently been released from jail, and Krueger testified that although a person would not be released from jail if there was an outstanding warrant unless they had been given a court appearance date, he requested a warrant check because something could have come up after defendant's release.

Defendant unbuckled his seat belt, and moved his hand to the center console. Krueger told defendant to put his seat belt back on. Defendant said he had not done anything, and appeared to Krueger to be digging for something on his left side. Krueger asked him what he was digging for and, concerned that defendant was trying to grab something or run off, called for backup.

CHP Officer Brian Wilson arrived as backup, and was told by Krueger he was concerned defendant would "foot bail." Wilson made "small talk" with defendant, who among other things asked whether they could just let him go as it was Christmas.

Meanwhile, Krueger received advice from dispatch that defendant had a felony warrant, and requested more backup.[4] CHP Officer Levi Sackett responded, and asked Bonde for the keys, which Sackett put on the roof of the car.

Krueger ordered defendant to get out of the car. Defendant refused, and continued reaching to his left. Wilson went to the driver's side and ordered Bonde to get out. Defendant pushed the door lock down several times, and continued to refuse orders to exit, telling the officers he did not have a warrant, that he had just been released from jail.

---

[4] Though dispatch confirmed the warrant, Krueger never asked dispatch to confirm whether defendant had recently been in jail and released.

6

More officers arrived, including from the Crescent City Police Department, one of whom was Officer Gene Votruba with his German Shepherd Django. Votruba told Wilson to get defendant's son out of the car. Defendant reached back, put his hand on his son's knee and told him to stay in the car; his son replied, "Dad, get out of the car." He did not. The officers were ultimately successful in getting defendant's son out of the car, and Bonde too was able to get out. Meanwhile, defendant began to get louder and more verbally aggressive.

Wilson testified he saw a knife by defendant's left side. Wilson walked to the passenger side, and as he did defendant moved his body toward the driver's side to try to close the door, but Wilson and Votruba were able to keep the driver's door open. And then Vortuba released Django, commanding him to "foss," German for "take-hold" or bite. And he did.

As Django began to chew on defendant, Sackett broke the right front passenger side window. When this happened, defendant moved back into the passenger seat and began "flailing."[5] Krueger joined Sackett and Wilson at the passenger side window and swung his baton, a 20-to-24-inch metal baton, at defendant at least six times, testifying he believed he only hit defendant twice—this, with defendant pleading, "why are you beating on me?" Then, after several dog bites and Krueger's strikes with the baton, Sackett, Krueger, and Gale all tased defendant.[6] This eventually caused defendant's muscles to lock up, and the officers pulled him out of the car. Then, as the

_____

[5] The Attorney General's brief asserts that defendant "retreated into the vehicle and grabbed glass from the window," and "began using both hands to throw glass at the officers." Some officers testified defendant was throwing glass at them; others felt defendant was hitting the glass window.

[6] At one point, Sackett and Gale deployed their tasers at the exact same time, which would have introduced a significant amount of electricity into defendant's body, perhaps as much as 100,000 volts.

video shown to the jury revealed, officers put knees on defendant's neck and back, with defendant screaming, "I can't breathe, I can't breathe," "That's illegal," and "you're killing me."

Defendant was handcuffed, after which he was placed on his side in a recovery position. And because of defendant's exclamation that he could not breathe, he was given oxygen and medical attention. He was then transported to a hospital with scrapes and puncture wounds to his left arm and shoulder and a bite wound to his right hand.

No officer testified that defendant made any threats or brandished a weapon. Some specifically testified to the contrary.

Ultimately, the officers found two knives on the ground, the one Wilson had observed and another. They also recovered a small canister from defendant's belt, which the parties stipulated contained a usable amount of methamphetamine.

The only defense witness was Sergeant Tiffany Williams from the Del Norte County Jail, who testified that defendant was booked into the jail on December 18 and released on December 21. Jail personnel are supposed to check for warrants prior to releasing a prisoner, and Williams signed defendant's release form unaware of any warrants. Williams acknowledged she did not personally check for warrants, and there was a lot of new staff, so Williams could not be certain a warrant check had occurred. Also, if a warrant had been issued by a federal judge on December 21, it could take a few days for it to be processed into the system, and it was possible the warrant was not in the system until sometime after defendant was released.

**The Proceedings Below**

On March 21, 2019, the Del Norte County District Attorney filed a second amended information charging defendant with eight counts, three

8

felonies and five misdemeanors:  count 1:  resisting a peace officer by force (Pen. Code, § 69)[7] on December 18 against Officer Dunaj; count 2:  resisting with force (*ibid.*) on December 25, against Officer Krueger; count 3:  resisting with force (*ibid.*) on December 25, against Officer Sackett; count 4: misdemeanor resisting arrest (§ 148, subd. (a)(1)) on December 18, against Officer Dunaj; count 5:  misdemeanor resisting arrest (*ibid.*) on December 18 against Officer Good; count 6:  misdemeanor possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)) on December 25; count 7: misdemeanor resisting arrest (§ 148, subd. (a)(1)) on December 25, against Officer Krueger; and count 8:  misdemeanor resisting arrest (*ibid.*) on December 25, against Officer Vortuba.  The information additionally alleged that defendant suffered two prison priors within the meaning of section 667.5, subdivision (b).

Opening statements and the People's case began on March 25, and involved testimony on portions of three days, March 25, 26, and 27, testimony that as best we can reconstruct from the court minutes totaled some 12 hours:  one and one-half hours on the 25th, less than six hours on the 26th, and five hours on the 27th.  Defendant's brief defense was the next day, following which the court and counsel devoted several hours to settling instructions and exhibits.  Closing arguments followed, and at 4:50 p.m. on March 28, the case was in the hands of the jury.

Jury deliberations began on the morning of March 29, and lasted for almost six hours, during which time the jury requested to see two videos of the December 25 incident.  The jury also asked this question about the law concerning defendant's "knowledge" as to count 6:  "Would a reasonable

---

[7] All statutory references are to the Penal Code, unless otherwise indicated.

person know of Points 2 and 3 of Health and Safety Code section 11377 (a) or do we have to know definitively if the defendant knew what was in the canister or does that create reasonable doubt."

At 3:22 p.m., the jury returned its verdict convicting defendant on all eight counts. This was followed that day by a bench trial where the court found true one of the two prison prior allegations.

On May 6, the trial court sentenced defendant to a sentence of five years four months, calculated as follows: the aggravated term of three years on count 1, consecutive to eight months (one-third the middle term) on both counts 2 and 3, plus one year for the prison prior. The court additionally imposed several thousand dollars in fines and fees.

## DISCUSSION

### The Standard of Review

As mentioned, defendant's first three arguments assert instructional error, a claim we review de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) This standard is applicable in "assessing whether instructions correctly state the law [citations], . . . and also whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration." (*People v. Posey* (2004) 32 Cal.4th 193, 218.) And in reviewing a claim of instructional error, we must consider whether there is a reasonable likelihood the trial court's instructions caused the jury to misapply the law in violation of the Constitution. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4; *People v. Lucas* (2014) 60 Cal.4th 153, 287; *People v. Frye* (1998) 18 Cal.4th 894, 957.)

That review leads to the conclusion there was instructional error here—error that was prejudicial.

10

**The Special Instruction Was Error**

All seven of the obstruction and resisting arrest counts required the People to prove beyond a reasonable doubt that the officers were lawfully performing their duties at the time defendant resisted. Thus, the trial court properly gave CALCRIM No. 2652 for misdemeanor resisting arrest and CALCRIM No. 2656 for resistance by force, both of which in the course of their lengthy text require the People prove that "when the defendant acted, the officer was performing his lawful duty," and both of which go on to instruct that "[a] *peace officer* is not lawfully performing his or her duties if he or she is unlawfully arresting or detaining someone or using unreasonable or excessive force in his or her duties. Instruction 2670 explains when an arrest or detention is unlawful or when force is unreasonable or excessive."

The jury was also instructed with CALCRIM No. 2670, that "a peace officer is not lawfully performing his or her duties if he or she is unlawfully arresting or detaining someone or using unreasonable or excessive force in his or her duties."

So far, so good. Then, on the very next page, the court gave this instruction:

"An individual's decision to commit a new and distinct crime, even if made during or immediately after an unlawful detention, is an intervening act sufficient to purge the 'taint' of a theoretically illegal detention. If you believe that the defendant was acting lawfully and that the police detained him unlawfully, a defendant's subsequent conduct in obstructing, resisting, or delaying the officers, if it occurred, can be an independent act that dissipated the taint from the initial unlawful seizure. [¶] If there was unlawful detention, you may conclude that a choice to flee or to resist arrest are

11

independent intervening acts sufficiently distinct from an illegal detention to dissipate the taint of an illegal detention."

The genesis of this instruction is not definitively shown by the record, though we surmise from the colloquy it was submitted by the People. Regardless, the Attorney General's brief describes this special instruction as "a correct statement of law pursuant to *People v. Cox* (2008) 168 Cal.App.4th 702." For his part, defendant says the "language of this instruction was pulled nearly verbatim" from *In re Richard G.* (2009) 173 Cal.App.4th 1252, 1262. But whatever its origin, the instruction has no place here, as both cases involved motions to suppress, not jury instructions.[8] So, while the instruction may be an accurate quotation from *Richard G.* or *Cox*, the instruction is a misstatement of law in the context of this case: It had the effect of undermining defendant's defense that he was unlawfully stopped during the first incident and unlawfully beaten during the second, not to mention that it eliminated one of the elements of the crime the People were required to prove—lawful activity by the officers.

As our Supreme Court has observed, in order to be "perform[ing] a lawful duty," the officer must be acting lawfully. (*In re Manuel G.* (1997) 16 Cal.4th 805, 818; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1217.) "The lawfulness of the officer's conduct is an *essential element* of the offense of

_____

[8] For example, in *In re Richard G.*, defendant punched a police officer after he was stopped. He argued that, because the stop violated his Fourth Amendment rights, evidence that he punched the officer had to be suppressed as a fruit of the poisonous tree. The Court of Appeal rejected this argument generally in the language quoted in the jury instruction above, after citing a long line of cases holding that the policy reasons for excluding evidence for Fourth Amendment violations are hardly served by excluding evidence of a defendant's subsequent acts of violence against police. (*In re Richard G.*, *supra*, 173 Cal.App.4th at pp. 1252–1254, 1260–1263.) *People v. Cox*, *supra*, 168 Cal.App.4th 702 is similar.

resisting . . . a peace officer." (*In re Chase C.* (2015) 243 Cal.App.4th 107, 115.) As one Court of Appeal put it in a section 148 case, "[I]f a defendant is charged with violating section 148 and the arrest is found to be unlawful, a defendant cannot be convicted of that section," adding that an unlawful arrest includes both one made without legal grounds and one made with excessive force. (*People v. White* (1980) 101 Cal.App.3d 161, 166–167.) Another court has noted that the trial court has a sua sponte duty to instruct that the defendant is not guilty of the offense charged if the arrest was unlawful. (*People v. Olguin* (1981) 119 Cal.App.3d 39, 46–47.) And another noted that, on request, the court must instruct that the prosecution has the burden of proving the lawfulness of an arrest beyond a reasonable doubt. (*People v. Castain* (1981) 122 Cal.App.3d 138, 145.)

In short, if the arrest is unlawful, the defendant may not be convicted of violating of section 69 or section 148. Despite that, the instruction here acted to revive any unlawful conduct by the officers, to "dissipate the taint of it"—to "purge" it. It was a plain misstatement of law in the circumstances here. It was error.

*People v. Maurer* (1995) 32 Cal.App.4th 1121 (*Maurer*) is instructive. There, Maurer was charged with several violations of section 647.6, unlawful sexual contact with a minor. The trial court instructed on the elements of the crime, including that defendant had to be " 'motivated by an unnatural or abnormal sexual interest . . . .' " (*Maurer*, at p. 1125.) This was followed immediately by the trial court instructing the jury that " '[m]otive is not an element of the crime charged and need not be shown.' " (*Ibid.*) Maurer was convicted on two counts, which the Court of Appeal reversed, rejecting the state's arguments that these instructions did not "cancel" one another out. To the contrary, the court concluded the second instruction directly

13

contradicted the first instruction on the mental state of the charged crime, and was therefore improper. (*Id.* at pp. 1126–1127.)

Likewise here. The jury was properly instructed on the elements of the charged offenses, including the requirement that the officers were engaged in the lawful performance of their duties at the time of the offenses. But just as in *Maurer*, *supra*, 32 Cal.App.4th 1121, the trial court also gave a separate— and wholly contradictory—instruction on the lawful performance element, this time telling the jury that the defendant's actions "after an unlawful detention, is an intervening act sufficient to purge the taint of a theoretically illegal detention," to "dissipate the taint." In no uncertain terms, this allowed the jury to find that officers were acting *unlawfully*, that defendant resisted, and that this resistance transformed the officers' *unlawful* conduct into *lawful* conduct.

Use of language from a case involving a motion to suppress as a basis for a special jury instruction here was improper, as trial courts have been told for decades. More than 50 years ago, Division One of this court observed that what the trial court did here was a "dangerous practice" that had been "frequently criticized by courts." (*Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 718 (*Fibreboard*).) Justice Kaus cited *Fibreboard* in support of his court's observation that to "instruct juries by the use of quotations from appellate opinions taken out of context is to court disaster." (*People v. Ramirez* (1974) 40 Cal.App.3d 347, 355.)

The Supreme Court weighed in on this in *People v. Colantuono* (1994) 7 Cal.4th 206, 221, fn. 13, observing as follows: "Indeed, this case illustrates the danger of assuming that a correct statement of substantive law will provide a sound basis for charging the jury. (See *People v. Smith* (1989)

14

214 Cal.App.3d 904, 912–913; *People v. Adams* (1987) 196 Cal.App.3d 201, 204–205; see also *People v. Gibson* (1965) 235 Cal.App.2d 667, 669.) The discussion in an appellate decision is directed to the issue presented. The reviewing court generally does not contemplate a subsequent transmutation of its words into jury instructions and hence does not choose them with that end in mind. We therefore strongly caution that when evaluating special instructions, trial courts carefully consider whether such derivative application is consistent with their original usage. . . .' "

More recently, we ourselves confirmed all of this, in *People v. Hunter* (2011) 202 Cal.App.4th 261, 277–278, where our Presiding Justice Kline distilled the criticism this way: "The challenged instruction was given in this case because, as in *People v. Colantuono* (1994) 7 Cal.4th 206, the trial judge much too quickly assumed 'that a correct statement of substantive law will provide a sound basis for charging the jury.' (*Id.* at p. 221, fn. 13; accord *People v. Adams* (1987) 196 Cal.App.3d 201, 204–205 ['Language in an appellate court opinion which may be a good statement of law or of the reasoning of the appellate court does not necessarily make a good jury instruction']; see *People v. Smith* (1989) 214 Cal.App.3d 904, 912–913; *People v. Ramirez* (1979) 40 Cal.App.3d 347, 355; *People v. Hudgins* (1967) 252 Cal.App.2d 174, 183; *People v. Odom* (1937) 19 Cal.App.2d 641, 649.) But, as this case shows, '[t]he discussion in an appellate decision is directed to the issue presented. The reviewing court generally does not contemplate a subsequent transmutation of its words into jury instructions and hence does not choose them with that end in mind.' (*People v. Colantuono*, at p. 221, fn. 13.) For this reason, our Supreme Court has strongly cautioned 'that when evaluating special instructions, trial courts carefully consider whether

15

such derivative application is consistent with their original usage.' (*Ibid.*) The trial judge in this case neglected to make that necessary inquiry."

Giving this special instruction was error. Likewise giving CALCRIM No. 250.

**The Instruction on Mental State Was Error**

All eight counts with which defendant was charged had an element dealing with his mental state. As to the three resisting with force counts, the jury was told that the People had to prove beyond a reasonable doubt that defendant "knew the executive officer was performing his duty." As to the four resisting without force counts, the jury was instructed the People must prove defendant "knew, or reasonably should have known, that the peace officer was a peace officer performing or attempting to perform his duties." And as to the possession of methamphetamine count, the jury was instructed that the People had to prove beyond a reasonable doubt that defendant "knew of [the drug's] presence" and "knew of the substance's nature or character as a controlled substance."

Despite that, the jury was then given another, and contradictory, instruction, CALCRIM No. 250, which instructed the jury it could convict defendant on all counts solely if it found "he intentionally [did] a prohibited act; however, it is not required that [he] intended to break the law"—an instruction, we are constrained to note, given despite the express boldface warning in the use notes that "[T]his instruction **must not** be used if the crime requires **a specific mental state**, such as **knowledge** . . . , even if the crime is classified as a general intent offense." (Bench Notes to CALCRIM No. 250.)

Defendant's mental state was hotly contested. For example, as to the first incident, defense counsel argued at length the various grounds

16

defendant had to believe the officers were not lawfully performing their duties.  As to the second incident, counsel argued that, as defendant said, he had no warrant as he had just been released from jail, also focusing on the officers' conduct as they beat him with the baton and tased him, all while he was under attack by Django.  And it was similar as to the methamphetamine possession charge, a knowledge issue the jury itself homed in on, asking the question quoted above.

**The Errors Were Prejudicial**

Turning to the first instruction error, the giving of the special instruction, "The failure to instruct on the elements of a charged crime is serious constitutional error that impacts a defendant's fundamental right to a jury trial." (*People v. Merritt* (2017) 2 Cal.5th 819, 821.)  Such error violates a defendant's due process rights.  (See generally *United States v. Gaudin* (1995) 515 U.S. 506, 512–515; *Maurer*, *supra*, 32 Cal.App.4th at p. 1128.)  As *Maurer* held, the removal of an element of the crime—there, defendant's mental state—constitutes a denial of federal due process and invokes "the *Chapman* 'beyond a reasonable doubt standard' for assessing prejudice." (*Maurer*, *supra*, 32 Cal.App.4th at p. 1128, citing *People v. Guiton* (1993) 4 Cal.4th 1116, 1130; *People v. Lee* (1987) 43 Cal.3d 666, 673–674; and *Chapman v. California* (1967) 386 U.S. 18, 24.)  And in order to meet this burden, the People must prove beyond a reasonable doubt that the omitted element was "uncontested" and "supported by uncontroverted evidence" (*Neder v. United States* (1999) 527 U.S. 1, 17–18), a burden, *Neder* added, the People cannot carry where "the defendant contested the omitted element and raised evidence sufficient to support a contrary finding."  (*Id.* at p. 19.)

That, of course, is the situation here, where the lawful performance element of the resisting charges was contested as to both incidents.  As to the

17

first incident, the contest was based in part, as the Attorney General concedes, on testimony that was "admittedly confused" such that "the potential existed for jurors to find an illegal detention," and included defense counsel's argument that the Vehicle Code violations Dunaj claimed to have observed never happened. And as to the second incident, counsel focused on the excessive force involved, with rhetorical flourishes such as: "What does he do next that justifies the nuclear option of a dog whose only purpose is to bite him? What has he done to justify having a metal baton swung at his body six successive times with forethought, with intent and power? What has he done to justify having two separate TASERs deployed from the same side of the car at the same time?"

Lawful performance was hardly "uncontroverted" or "uncontested." And it was contested for good reason, including Dunaj's inconsistent testimony; his admissions; the video of the first incident, which shows the conduct of the officers as defendant screams at one point, "Why are you beating on me?"; and the video of the second incident where, after pulling defendant out of the car, they put their knees on defendant's neck and back, all while he screams, "I can't breathe! That's illegal," and, "You're killing me!"

Turning to the second instructional error, the conflicting instructions on defendant's knowledge, this too was a significant part of the defense, including as to the first incident, that defendant had committed no traffic infractions. And as to the second incident, counsel pointed to defendant's belief that, contrary to what officers were saying, he did not have a warrant given his recent release from jail. Further, it was reasonable that defendant—being bitten, beaten, and tased—could hold a belief that officers were not acting in the performance of their duties while doing this to him.

18

Finally, as to count 6, possession of methamphetamine, defense counsel devoted pages of his closing argument to the knowledge element. The knowledge element was anything but "uncontested," and the jury's question shows that the evidence was hardly overwhelming. Superimposed on all of this is the fact the jury deliberated for nearly six hours, during which they asked to view two videos. This shows a close case. (*People v. Woodard* (1979) 23 Cal.3d 329, 341 [deliberations nearly six hours demonstrate "guilt . . . was far from open and shut"].)

In light of our conclusions above, we need not address defendant's remaining claims, as those issues may or may not be pertinent in the event defendant is retried. And we will not offer any guidance on defendant's claim that the jury must be instructed on unanimity, other than to refer to the use notes of CALCRIM No. 2656: "If the prosecution alleges multiple, distinct acts of resistance, the court has a **sua sponte** duty to instruct on unanimity."

## DISPOSITION

The judgment is reversed.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Stewart, J.

*People v. Southard* (A157236)

Trial Court:                          Del Norte County Superior
                                      Court

Trial Judge:                          Honorable Darren McElfresh

Attorney for Plaintiff and            Attorney General of California,
Respondent The People:                Xavier Becerra; Chief
                                      Assistant Attorney General,
                                      Lance E. Winters; Senior
                                      Assistant Attorney General,
                                      Jeffrey M. Laurence;
                                      Supervising Deputy Attorney
                                      General, Catherine A. Rivlin;
                                      Deputy Attorney General,
                                      Bruce M. Slavin

Attorney for Defendant and            By Appointment of First
Appellant John Wesley                 District Appellate Project
Southard                              Independent-case System,
                                      Rudolph J. Alejo.