Filed 12/13/21  P. v. Krueger CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E075982 |
| v. | (Super.Ct.No. SWF1800641) |
| CURTIS LEE KRUEGER, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Kelly L. Hansen, Judge. Affirmed.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Michael D. Butera, Deputy Attorneys General, for Plaintiff and Respondent.

After assaulting Henry Stange by striking him in the head with a hammer in early 2018, defendant Curtis Krueger, a Marine Corps lieutenant stationed at Marine Corps Air Ground Combat Center Twenty-Nine Palms (Twenty-Nine Palms), attacked him again a few months later, killing him in the victim's garage. The defendant and his girlfriend, who had been cheating on defendant with Stange, then took him out to the desert in Joshua Tree National Park for burial in a shallow grave, where he was discovered by hikers several days later. Defendant was charged and convicted by jury of assault with a deadly weapon (Pen. Code[1], § 245, subd. (a)(1) [hammer], count 1), and murder (§ 187, subd. (a), count 2). The jury set the degree of the murder at second degree, whereupon defendant was sentenced to three years on the assault count with a consecutive indeterminate term of 15 years to life. He appeals.

On appeal, defendant raises a single issue, challenging a modification made to the instruction pertaining to manslaughter, which defendant argues was an improper pinpoint instruction. We affirm.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## BACKGROUND

Defendant Curtis Krueger enlisted in the Marines when he was 17, transitioning to an officer after obtaining his four-year degree. He was proficient in martial arts, holding a black belt, and was extremely fit.

Defendant met his girlfriend, Ashlie Stapp, through his cousin Angeline, who worked with Ashlie at Jamba Juice, while he was stationed at Twentynine Palms. Angeline's family had asked Ashlie to feed and walk their dog while they went on a trip to Mexico, and defendant was staying at the house on the weekends.

Angeline tried to discourage defendant from getting involved with Ashlie because Angeline was aware that Ashlie was abusing prescription drugs and was promiscuous. Ashlie's drug use stemmed from a hip injury she sustained at age 23, for which she was prescribed Norco and Percocet as painkillers. She quickly became dependent on the drugs, so when her prescription would run out, she would buy pills from outside people who were selling the medication illegally. By 2016 or 2017, her addiction was costing approximately $600 per day, an amount for which her paycheck from Jamba Juice was inadequate. When she could not cover her purchases, she would either steal pills from her stepfather, get "fronted" pills for which she would have to pay later, or she would exchange sexual favors with multiple partners in exchange for drugs.

To find pill providers, Ashlie consulted Craigslist, where she met victim Henry Stange. Henry had been involved in a few serious motorcycle accidents which left him with a slight limp and chronic pain, for which he originally had prescriptions for Norco

3

and Gabapentin, but, when those did not work, he was put on Oxycodone in pill form. After Ashlie's initial purchase of Oxycodone from Henry, she would go to his home in Murrieta for purchases, where she exchanged sex for pills if she did not have cash, before she met defendant.

After meeting defendant in 2017, Ashlie hid her drug use from him, and they started dating a few months after the dog-sitting week. But she still met with Henry approximately once a month. On some occasions, she would fall asleep and wake up naked, feeling she had been violated while asleep. On one occasion, she awoke to discover she had been tied to the master bed, something for which she had not consented. She did not tell the defendant she had been assaulted, and she continued to see Henry even after the assault.

During this period, she was seeing defendant, to whom she introduced her family as her boyfriend and with whom she had discussed marriage, while also seeing Henry for her drug fixes, knowing that Henry thought of her as his girlfriend, and had introduced her to his ex-wife and children, as well as his neighbors and fellow ham radio enthusiasts as such. She admitted she manipulated the situation in order to continue obtaining drugs from Henry.

Ashlie and the defendant began seeing each other in the fall of 2017. In December, defendant began making notes to himself. By January 2018, defendant would stay on the base during the week, and on weekends they "camped" at an abandoned house near Joshua Tree or Twentynine Palms.

4

However, defendant became concerned about Ashlie's drinking and driving, especially after two incidents in which she drank to excess. One incident occurred at a family dinner when defendant noticed she lacked self-control while drinking, and the second incident involved her drinking and disappearing, only to be found later, passed out in her car in the desert. He asked her to share her location on her cell phone with him, so in case she got lost again, he could find her, and she agreed.

At a gathering of Ashlie's family in Fresno in January 2018, Ashlie threw her phone on the ground and stomped off after reading a message; defendant looked at her phone and saw an email from Henry. Defendant sent Henry an email telling him to leave Ashlie alone or he would regret it. A few days later, defendant noticed Ashlie had turned off her phone, preventing him from locating her.

This caused defendant to suspect Ashlie of infidelity with Henry. She had begun lying about where she was going and would turn off her phone in order to prevent defendant from knowing her whereabouts. On January 22, 2018, defendant went to work leaving Ashlie at the abandoned residence they occupied. He thought she was still there, but when he arrived at the property, she was gone, along with the blankets and pillows the couple used. At some point, defendant contacted his cousin Angeline to discuss his discovery of Ashlie's drug use, and how he was going to track her Snapchat and her phone. Defendant called his cousin Angeline at some point that day and informed her he had discovered Ashlie's potential infidelity by going through Ashlie's phone.

When Ashlie finally turned on her phone, she was at a gas station with a convenience store not far from Henry Stange's residence. Defendant met her at this location and confronted her, learning about her drug-and-sex-lifestyle. However, Ashlie made herself out to be a victim by telling defendant that Henry had raped her, not disclosing the true nature of the relationship.

Ashlie and defendant then drove to Henry's residence where defendant entered the house and struck Henry in the head with a hammer while Ashlie waited in defendant's truck. A short time later, defendant returned to the truck and told Ashlie he had done something bad. The hammer was bent out of shape from the force of the blows. Back at the abandoned residence, defendant threw the hammer into the desert. Text messages between defendant and his immediate supervisor indicate defendant had informed the captain that he was dealing with family over the phone, a cousin who was suicidal, to explain his absence.

The next day, Ashlie was worried about Henry's welfare and went back to his residence, where Henry informed her defendant had hit him over the head with a hammer. Henry appeared to have suffered a serious concussion and was bleeding from his ear. Also around that day, defendant informed Angeline he was going stay with Ashlie; at the end of the conversation, defendant admitted he had gone to Henry's house and hit him over the head with a hammer.

Although defendant decided to remain in the relationship with Ashlie, soon other things made him suspicious. At this point, defendant began making notes to himself. On

6

February 3, 2018, he made a note about January 22, 2018, and mentioned someone named Joshie, and on February 14, 2018, he wrote that Ashlie had cheated on him with Henry. He also made a note referring to December 6 or 7, 2017, when he had received no reply from Ashlie, that it was "likely she was fucking Henry for drugs."

After that, other things caused defendant suspect Ashlie of disloyalty. For one thing, although she agreed to see a therapist, when she returned from appointments her eyes were dilated differently than normal. He also took screenshots of her cell phone where certain names came up. On February 2, 2018, defendant made a note to himself about what a fool he was for thinking things would work out because she cheated on him with Henry twice for drugs. On March 21, 2018, he made a note about continuing surveillance on Ashlie's phone, noting the phone's movement within the residence. Then he sent her a text message to ask why she turned off her phone nine minutes away from Henry's house.

Defendant also intercepted a text message from someone named John to Ashlie, and responded to John that he was aware of the texts from John because he had hacked her phone. He sent reply texts to other people who had texted Ashlie. Emails from Ashlie's email account were also forwarded to defendant's email, without her knowledge. Although defendant had deleted all her male contacts, Ashlie continued to connect with male companions, lied about her whereabouts, and would turn off her phone and location service to avoid being located.

This made defendant more suspicious, although in April of 2018, he became engaged to Ashlie, while she continued to sleep with both defendant and Henry. On May 23, 2018, Ashlie received an email from Henry indicating he had obtained some Oxycodone that day and inviting her to an "oxy party." The next day, Ashlie made up an excuse, sending a text message telling defendant she had to get some suitcases from her mother's house. She then drove to her mother's house and left her telephone there, outside, because no one was there. Then she drove to Henry's house in Murrieta.

At noon that day, an event had been planned for military personnel in defendant's unit and family members. Ashlie was supposed to attend the event. When he received the message from Ashlie about the suitcases, defendant became suspicious. But he checked her phone location and saw that Ashlie was headed toward her mother's residence. He called Ashlie's mother and learned she was out of town. He then went to the Family Day event for a short time, but felt something was not right, and told his major that he was concerned that Ashlie was suicidal, requesting permission to leave to locate her.

In the meantime, because the drive from Twentynine Palms to the location of Ashlie's mother's house would take too long, defendant contacted 911 to request a welfare check on her because she might be suicidal. A patrol officer went by the location but did not find anyone at home and did not see Ashlie's car.

Defendant eventually arrived at the location, confirming that she was not there. He dialed Ashlie's number and eventually found her phone on the lawn. He texted the

8

major again indicating he had found Ashlie's phone but Ashlie was not there. Considering the possibility that she had left her phone there to mislead him as to her location, defendant decided to go to Henry Stange's residence.

At Henry's house, Ashlie and Henry had ingested the Oxycodone to get high and then had sex together. Afterward, Ashlie went into the bathroom while Henry went into the garage where he played music and transmitted on his ham radio about Ashley being there with him. The garage door was open, as was usual. When she finished what she was doing in the bathroom, she heard sounds like wrestling around in the garage and she heard Henry scream. The defendant entered the residence and told Ashlie he had done something bad and they needed to leave.

Defendant and Ashlie left through the open garage where Ashlie could see Henry on the floor of the garage. They drove their respective vehicles back to Ashlie's mother's residence where Ashlie could leave her car. They decided to return to the crime scene to get rid of the surveillance cameras Henry had around the house and to clean up any tracks that could lead back to them. Ashlie cleaned the scene with bleach and grabbed Henry's Oxycodone prescription, while defendant grabbed the computer and cameras. Then they backed defendant's truck up to the garage and they put Henry's body in the bed of the truck. They also took all of Henry's cell phones, went out to the desert and drove around until they found a spot where they buried Henry in a shallow grave. After the burial, they returned to the trailer in which they were living at that time, where defendant disposed of the blankets, computer, and cell phones.

9

On June 1, 2018, two hikers saw vultures hanging out in an area of Joshua Tree National Park. The vultures were near a shallow grave and bones were visible, so the hikers made a report the next day. On June 2, 2019, Henry's remains were found in the shallow grave; there had been animal activity and the lower portion of the body was sticking out of the grave, while the upper body remained covered.

Fingerprints obtained from the body and rehydrated confirmed the identity of the body as that of Henry. His body was in a state of partial decomposition, with more than one blunt force injuries on his head (at least two), resulting in multiple fractures, as well as sharp force injuries on the left side of the neck. It was not likely that the head injuries were caused by a fist, but stomping could have caused the fractures to the side of the head. One of the sharp force injuries to the neck was approximately two inches in depth, penetrating the esophagus, and approximately four centimeters (approximately one and one-half inches) wide. On the back of the head were what was described as a chop-type injury, caused by either a blunt or sharp force. It had all the features of a blunt-force injury, but decomposition affected the appearance of the wound, giving it a sharp force component as well. The blunt force injuries to the head could have been caused by a weight on a barbell. A barbell weighing five pounds was located under the boat in the garage.

Of the head injuries, the fractures on one side of the head appeared different from the fractures on the other side. The skull fractures on the left side of the head could have been caused by stomping. The fracture on the right side of the head is consistent with the

10

head being on a flat surface when force was applied, or hitting a flat surface after force was applied. The blood pattern on the underside of the boat under which the victim was killed, indicated he had been struck a minimum of twice, the second time occurring when his head was near the ground. The cause of death was attributed to homicidal violence.

After Henry's identity had been established, and his residence was determined to be the crime scene, the investigation led to the identification of Ashlie, and ultimately to defendant through emails on Ashlie's computer. Defendant was charged by way of information with one count of assault with a deadly weapon (§ 245, subd. (a)(1), count 1), and one count of murder (§ 187, subd. (a), count 2).

Defendant was tried by a jury. After the People rested, defendant presented the testimony of his ex-wife and Ashlie Stapp, and testified in his own defense. Regarding count 1, defendant admitted striking Henry in the head with a hammer, but indicated that Ashlie had accompanied him into the victim's residence to collect some belongings she had left there. She went in and got her stuff but as she came out, a person (Henry, the victim) jumped from behind the couch and tried to stop her. When defendant struck him with the hammer, he was overreacting.

Regarding the murder, defendant indicated he was concerned about Ashlie because on May 23, 2018, she had walked into traffic after leaving the trailer in an angry state, and was nearly struck by a truck. The next day he went to work and then left to meet his unit at the football field for the family event that Ashlie was supposed to attend. She had left the house after texting him about picking up suitcases. Defendant called

11

Ashlie's mother and discovered she and her husband were in Las Vegas, but using the phone location application, he could see that Ashlie was heading towards her mother's house. He went on to the family event expecting Ashlie to show up, but felt something was not right, so he discussed his concern with his major. Ashlie did not respond to his texts so defendant drove to her mother's residence after calling 911, because it would take him two hours to get to the location.

Ashlie was not at her mother's house, but defendant eventually found her cell phone there. He decided to check the house where she had said she had been raped, and saw her car parked in the victim's driveway. He had decided that if she was cheating on him, he would break up with her.

Defendant walked up the driveway where the garage door was open, the victim was inside. The victim gestured to defendant to enter the garage and told defendant Ashlie was not there, despite the presence of her car in the driveway. Then the victim approached defendant with a knife and tried to stab the defendant. Defendant jumped back and then slapped the victim's hand down, grabbing Henry's wrist and taking the knife from the victim. Defendant struck the victim in the neck because he thought Henry was going to kill him.

After stabbing Henry's neck, the defendant pushed the victim away and they ended up at the back wall of the garage near the rear of the boat. Defendant tripped and almost fell on Henry, at which point defendant realized, as the victim was falling, that he was wearing only underwear. Defendant fell on top of him as the victim grabbed a metal

disk and swung at defendant.  Defendant also managed to disarm Henry of this implement, using it to smash the victim's head.  Defendant then attempted to escape but Henry grabbed his ankle, so defendant stomped him on the head with his foot to get free.

Defendant then ran into the house expecting to find Ashlie tied up but instead found her in the bathroom.  Defendant told her they need to go because he did not know if the victim was going to come after him.  Later, after discussing whether to call an ambulance for Henry, Ashlie convinced defendant not to contact police, so they decided to bury the victim in the desert.

The jury convicted defendant of both counts but set the degree of the murder at second degree.  He was sentenced to serve the middle term of three years for the assault with a deadly weapon (count 1), with a consecutive indeterminate term of 15 years to life for the second degree murder.  On October 22, 2020, defendant timely appealed.

**DISCUSSION**

*a.  Background*

The sole issue presented for review involves asserted instructional error in making a modification to the manslaughter-heat of passion instruction, CALCRIM No. 570.  The first part of the instruction addresses the defense of imperfect self-defense.  The modification was requested by the People, without objection by defendant, based on the

13

decision in *People v. Moye* (2009) 47 Cal.4th 537 (Moye).[2]  As modified, the instruction

read (modification in bold):

"A killing that otherwise be murder is reduced to a voluntary manslaughter if the

defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or heat of passion if:

1.      The defendant was provoked;

2.      As a result of the provocation, the defendant acted rashly and under the

influence of intense emotion that obscured his reasoning and judgment; and

3.      The provocation would have caused a person of average disposition to act

rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion.  It can be

any violent or intense emotion that causes a person to act without due deliberation and

reflection.

"In order for heat of passion to reduce a murder to a voluntary manslaughter, the

defendant must have acted under the direct and immediate influence of provocation as I

have defined it.  **Additionally, the provocation which incited the defendant to kill in**

**the heat of passion must have been caused by the decedent or have been conduct**

---

[2]  The People argue defendant has forfeited the challenge by failing to object to
the modified language of the instruction. However, we may, without objection or
"exception having been taken in the trial court, review any question of law involved in
any ruling, order, instruction, or thing whatsoever said or done at the trial or prior to or
after judgment, which thing was said or done after objection made in and considered by
the lower court, and which affected the substantial rights of the defendant." (§ 1259;
*People v. Carey* (2007) 41 Cal.4th 109, 132.)

14

**which the defendant reasonably believed was caused by the decedent**. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or a long period of time.

"It is not enough that the defendant was simply provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"If enough time passed between the provocation and the killing for an ordinary person to of average disposition to 'cool off', or regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on that basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or in the heat of passion. If the People have not met this burden, then you must find the defendant not guilty of murder." (CALCRIM No. 570.)

Defendant argues that the additional highlighted language inserted in CALCRIM No. 570 misinformed the jury that the decedent had to have been the cause of the provocation as opposed to just engaged in conduct resulting in provocation. We disagree.

Assertions of instructional error are reviewed de novo: "'Whether or not to give any particular instruction in any particular case entails the resolution of a mixed question

15

of law and fact that, we believe, is however predominantly legal.  As such, it should be examined without deference.'"  (*People v. Shaw* (2002) 97 Cal.App.4th 833, 838, quoting *People v. Waidla* (2000) 22 Cal. 4th 690, 733.)

### b.  Legal Principles and Analysis

"A trial court must instruct on lesser included offenses when there is substantial evidence that the defendant committed the lesser offense instead of the greater."  (*People v. Dominguez* (2021) 66 Cal.App.5th 163, 175, citing *People v. Vasquez* (2018) 30 Cal.App.5th 786, 792.)  "Manslaughter is a lesser included offense of murder."  (§ 192; *People v. Beltran* (2013) 56 Cal.4th 935, 942, citing *People v. Thomas* (2012) 53 Cal.4th 771, 813.)

In a homicide case, the trial court has a sua sponte duty to instruct on voluntary manslaughter as a lesser included offense of murder whenever there is evidence from which a reasonable jury could conclude that a manslaughter, but not a murder, was committed.  (*People v. Breverman* (1998) 19 Cal.4th 142, 162.)  This duty includes instruction on voluntary manslaughter due to a sudden quarrel or heat of passion when there is substantial evidence that shows such a theory is relevant.  (*Id*. at pp. 154-155.)  The theory may apply even in cases when the defendant intended to kill.  (*Id.* at p. 163.)

Sufficient provocation and sudden quarrel present mitigating circumstances that may afford a defendant "partial exculpation" for murder that results in a conviction for manslaughter.  Sufficient provocation either negates the element of malice required for murder or causes it to be disregarded as a matter of law.  (*People v. Beltran, supra***,** 56

16

Cal.4th at p. 942; *People v. Bryant* (2013) 56 Cal.4th 959, 968; see also, *People v. Moye* (2009) 47 Cal.4th 537, 549.)

"In determining the adequacy of jury instructions, we consider the entire charge of the court and assume jurors are intelligent people capable of understanding and correlating all the instructions given." (*People v. King* (2010) 183 Cal.App.4th 1281, 1316.) "An instruction is considered flawed only if there is "'a reasonable likelihood that the jury misconstrued or misapplied the words" of the instruction. [Citation.]' [Citation.]" (*Ibid.*)

"[A] defendant is not entitled to have instructions couched in any particular language so long as the instructions given fully and fairly state the applicable law." (*People v. Ranson* (1953) 119 Cal.App.2d 380, 388.) Moreover, a prosecutor has the right to request "pinpoint instructions" to clarify or amplify the standard instructions or limiting instructions. (*People v. Moore* (1954) 43 Cal.2d 517, 526; *People v. Hunter* (2011) 202 Cal.App.4th 261, 275, fn.3.)

"A heat of passion theory of manslaughter has both an objective and a subjective component." (*People v. Moye*, *supra,* 47 Cal.4th at p. 549, citing *People v. Manriquez* (2005) 37 Cal.4th 547, 584; *People v. Steele* (2002) 27 Cal.4th 1230, 1252; *People v. Wickersham* (1982) 32 Cal.3d 307, 326–327.) The factor that distinguishes the heat of passion form of manslaughter from murder is the presence of provocation. (*Moye, supra*, 47 Cal.4th at p. 549.)

17

As the Supreme Court instructed in *Moye, supra*, at pages 549-550, quoting from *People v. Lee* (1999) 20 Cal.4th 47, 59: "'The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]'"

This concept was later cited in *People v. Trinh* (2014) 59 Cal.4th 216, 232, and *People v. Nelson* (2016) 1 Cal.5th 513, 540, among others. It therefore is a current and correct statement of California law.

At oral argument, defendant referred to the cases of *People v. Bridgehouse* (1956) 47 Cal.2d 406 and *People v. Wright* (2015) 242 Cal.App.4th 1461, cited in his briefs on appeal, and urged us to hold that the pinpoint instruction was erroneous because it did not accurately explain that the provocation needed for heat of passion may be satisfied by both conduct by the victim as well as conduct the defendant reasonably believed was "engaged in" by the decedent. However, neither of these decisions involved the instruction challenged on appeal.

In *Bridgehouse*, the California Supreme Court found insufficient evidence to support the defendant's conviction of second degree murder where "there was no malice shown, either express or implied; there was no showing of any premeditation, either express or implied; there was no evidence of an 'abandoned and malignant heart.' There

18

was ample, uncontradicted, evidence that defendant was a man of excellent character; that he was mentally and emotionally exhausted and was white and shaking.  It appears to us, as a matter of law, that under the circumstances here presented there was adequate provocation to provoke in the reasonable man such a heat of passion as would render an ordinary man of average disposition likely to act rashly or without due deliberation and reflection [citation]." (*People v. Bridgehouse, supra*, 47 Cal.2d at p. 414.)

As for the provocation element, *Bridgehouse* observed that defendant was provoked not only by his wife's conduct but also by the fact he did not expect to see the victim at the defendant's mother-in-law's house, which visibly upset him.  However, that passage was not the holding of the case.  Instead, it noted that the provocation needed to reduce a homicide to voluntary manslaughter may result from "the sum total of the circumstances which proved, as a matter of law, the existence of adequate provocation and heat of passion." (*Bridgehouse, supra*, 47 Cal.2d at p. 414; *People v. Wright, supra*, 242 Cal.App.4th at p.1489.)

The concurrence in *Wright* had expressed doubt about the continued vitality of the *Bridgehouse* holding where it was the wife's conduct that was provocatory, while the victim was just sitting in the den, "minding his own business." (*People v. Wright, supra*, 242 Cal.App.4th at pp. 1489, 1504.)  However, the majority responded that the Supreme Court in *Bridgehouse* considered the conduct of both his wife and her lover reprehensible and provocatory, giving rise to defendant's heat of passion. (*People v. Wright, supra*, at p. 1489.)

Neither *Bridgehouse* nor *Wright* analyzed the correctness of the language in the instruction challenged here, nor did either case hold that a jury must be instructed in specific language how the jury evaluates the provocation necessary to reduce the degree of the offense. Further, it is speculation to say the jury would have reached a different conclusion where the principles stated in the instruction were substantially correct, modeled on the language of *Moye, supra,* 47 Cal.4th at pp. 549-550. Defendant points to differences between the language "conduct reasonably believed by the defendant to have been engaged in," found in *Moye, supra*, with the language used in this case. In *Moye*, the court stated, "The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or *be conduct reasonably believed by the defendant to have been engaged in by the victim.*" (*Ibid*., italics added.) In both versions, the emphasis is on the need for the jury to find that conduct by the victim or engaged in by the victim was the provocation for the killing.

Here, the language of the instruction referred to "conduct which the defendant reasonably believed was caused by the decedent." Defendant did not object, and the essence of the instruction informed the jury how to evaluate the presence or absence of provocation sufficient to warrant conviction of a lesser offense. The People requested the pinpoint instruction under circumstances that warranted the modification. And even if the instruction had been modified in error, there could be no prejudice because the defendant primarily relied on self-defense, imperfect self-defense, or defense of others.

20

"Because the instructions given were correct statements of the relevant legal principles, any purported error was necessarily harmless."  (*People v. Thomas* (2007) 150 Cal.App.4th 461, 467.)

There was no reversible instructional error.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

MILLER
J.

FIELDS
J.